152 N.J. Super. 333 (1977)
377 A.2d 1214
STATE OF NEW JERSEY, PLAINTIFF,
v.
LAWN KING, INC., A CORPORATION OF THE STATE OF NEW JERSEY, AND JOSEPH SANDLER, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided August 15, 1977.
*335 Mrs. Martha K. Kwitney, Deputy Attorney General, for the State (William F. Hyland, Attorney General of New Jersey, attorney).
Mr. John A. Craner for defendants (Messrs. Craner and Nelson, attorneys).
IMBRIANI, J.C.C.
Today this court is called upon to sentence Lawn King, Inc., a corporation, and Joseph Sandler for having violated the anti-trust laws of the State of New Jersey, N.J.S.A. 56:9-1 et seq. Because this is the first case of its kind in this State, and because many have questioned with increasing frequency the sentences imposed in the past by courts for anti-trust violations, in stating the reasons for imposing this sentence, as required by Criminal *336 Rules of Practice, R. 3:21-4(e), my remarks will be more extensive than usual because I feel it important to understand not only the nature of the problem presented, but also the proper role of the judiciary in its solution. See State v. Lawn King, Inc., 150 N.J. Super. 204 (Law Div. 1977).
A violation of the anti-trust laws has generally been described as a white collar crime. While the violator has committed a criminal offense, many in our society do not attach opprobrium to such conduct. Yet, the basis of the charge is that defendants have abused a trust, the result of which is destructive of the overall fabric of our society that is based upon the spirit of free enterprise.
While this is not the type of case in which there has been violence, I do take note of the fact that we are dealing with a case where this court has found that defendants compelled, coerced and threatened others to do certain acts. In this case the court, as trier of the facts, found that defendants compelled, coerced and threatened dealers at the retail level (1) to charge the public a certain fixed price, (2) to deal exclusively with those persons owning property within a defined area, (3) to purchase seed and chemicals only from Lawn King, Inc., and other demands. Thus, while the phrase "anti-trust violation" has a certain civil and legalistic connotation, the essence of the charge, at least in this case, is that there has been coercion, threats and force.
What has occurred is that defendants have taken monies from the public by an illegal scheme and pocketed that money for their own use. The amount of money taken from each individual is small, but the aggregate is substantial.
The taking of money from the public by such illegal activity is no different than the illegal taking of money by the butcher who puts his thumb on the scale or the vendor who dilutes his product with water or another product. In all of these cases the public is ultimately compelled to pay a greater price.
One may ask why this court should be troubled by this situation because the dealings between defendants and the *337 public would appear to be of a voluntary nature. The harms are several and real.
First, the simple fact is that the laws of this State were violated. The people of New Jersey, through their elected representatives, have determined by law a policy and procedure to govern commercial dealings. To permit continued violations would cause the law in general to be brought into general disrespect.
Second, the citizens of this State were harmed by being compelled to pay, for services rendered by Lawn King dealers, a price not set by the interplay of normal market forces, but rather by the dictates of these defendants. Whether that price was fair or even low at this time is irrelevant, because to permit defendants to fix prices today is to permit them to do so in the future. This cannot be tolerated.
Third, the franchise dealers, who have a right to conduct their business as they saw fit and in a free and unfettered manner, were compelled to conduct certain aspects of their business according to the dictates of defendants. The fact that many dealers did not complain, either because of fear of suffering financial harm or contentment with reaping a profit provided by the system, does not mitigate the harm.
Fourth, contrary to initial impressions, the dealings between defendants and others (especially the retail dealers) were not voluntary, but, in fact, were accompanied by threats and coercion of financial harm if defendants' orders were not obeyed.
It is generally assumed that violations of the anti-trust laws, both the federal and state, are being committed on a rather widespread basis. Indeed, these defendants have suggested that what they did was no different than what is being done by many other persons and corporations. This may be true, but regardless of how massive or complex the problem may be, I do not believe that a criminal court can abdicate its responsibility to enforce the law simply for that reason. The judicial system must function in each case by imposing a fair sentence upon those convicted, and, additionally, *338 in such a way as to have an important secondary function to encourage compliance with the antitrust laws.
As stated by our Supreme Court in State v. Ivan, 33 N.J. 197, 199 (1960), men have been divided for centuries as to the philosophical justification of the purposes of "punishment." Ivan suggests four (4) bases or aims: (1) retribution, (2) deterence of others, (3) rehabilitation of the defendant and (4) protection of the public by isolation of the offender.
What is the aim or purpose of this court today?
As to aim 1, "retribution," this is not a favored thesis in this day and age and I specifically reject it in this case.
As to aim 3, "rehabilitation of the defendant," that aim is not applicable in this particular case as to Joseph Sandler because the anti-trust statute has an interdict which prohibits him from ever entering into business for the rest of his life in the State of New Jersey. There is no need to rehabilitate Joseph Sandler. He is forever barred from doing business in New Jersey. He can no longer be in a position in this State to violate our anti-trust laws. As to Lawn King, which is permitted to continue in the same business, rehabilitation only requires that company policy be changed to conform with the law. I have been informed that this has already been done.
As to aim 4, "protection of the public by isolation of the offender," I see no necessity for such in this case. The interdict is sufficient to protect the public from Joseph Sandler in the future. As to the corporation, this aim is not applicable.
Joseph Sandler is 59 years old and in good health. He resides in Oakland, New Jersey, with his wife and 19-year-old son. An older second son resides in Livingston, New Jersey. All four are paid employees of Lawn King. Joseph Sandler has always owned 95% of the outstanding common stock of Lawn King. His average salary as president of Lawn King from 1972 to 1976 was $43,120. His wife and two *339 sons were paid an additional average annual salary of $58,761 during this five-year period.
Joseph Sandler served in the United States Army from 1942 to 1945 and was honorably discharged. He is a graduate of New York University. His employment history is excellent, he has never been convicted of a crime and, other than this offense, has been a good citizen and family man.
The real issue in this case is whether this court should and can impose a sentence as a deterrence to others. If so, how can this be accomplished?
In the past our courts have been faced with instances where the penalty of a fine and probation have not appeared to operate as a sufficient deterrence to others. For instance, courts have questioned the effectiveness of fines and probation for violations of the gambling laws, usury laws, loan sharking laws and others. Because the profits were so enormous, fines and probation alone appeared to have little or no effect in compelling adherence to the law. As a result, as discussed in the Ivan case, various courts deemed it necessary to incarcerate individuals, not solely to separate them from society or punish them but, also, to serve as a deterrence to others and warn them that violations of the law will not be countenanced.
I realize that there are those who question whether incarceration of an individual defendant has any deterrent effect upon the general public. But I am convinced that incarceration of an individual defendant, if given sufficient and wide publicity by the communication media, will deter others from violating the anti-trust laws of this State. I believe that many businessmen of this State will choose to abide by the law, rather than run the risk of severe punishment if they violate the law.
I take note of the fact that the Department of Justice for the United States of America, which has considerable and long experience with the anti-trust law, on February 24, 1977 issued a memorandum with guidelines for sentencing anti-trust violators. It noted that prison sentences are *340 uniquely effective in deterring individual anti-trust violators, who generally view a fine as merely a "license fee" for fixing prices, but who view the threat of a substantial prison term more seriously. Those guidelines suggest that a prison term of 18 months be used as a starting point.
I do not believe that incarceration for that period of time is required in this case for least two reasons. First, N.J.S.A. 56:9-11(b) provides an automatic interdict which prohibits Joseph Sandler from ever managing or owning any business organization within New Jersey, or from participating in any business corporate activity within New Jersey. This is a penalty not imposed by the federal anti-trust statute. Second, while the United States Department of Justice has set guidelines for sentencing anti-trust violators, the plain fact is that such guidelines have not been universally followed by the federal courts.
The position of the Department of Justice is not unique. For instance, in the July 1977 issue of Crime and Delinquency, in an article entitled "White Collar Crime" by John C. Watkins, Jr., the author commented that (at 303): "assuming * * * no extremely extenuating circumstances, a short prison term should be the traditional sanction."
It is apparent from what I have said that this is the type of case where the sentence to be imposed will be based upon the principle of deterrence to others. It is the hope of this court that this sentence will not be an isolated one, but rather the type of sentence which will be meted out by other courts in the future when sentencing for the same offense. Indeed, to be effective future sentences for anti-trust violations should be even more severe than the one I am about to impose, so as to provide an even greater deterrence. Obviously, to serve as a general deterrent to the public a sentence must have some sting and hurt, or it will lose its deterrent effect.
I first sentence Joseph Sandler. On the first and second counts of Indictment No. SGJ 14-73-15 charging restraints of trade in violation of the New Jersey Anti-Trust *341 Law, N.J.S.A. 56:9-3, on each count you are sentenced to a term of six months in the Mercer County Correctional Center, the service of said sentences to run concurrently with each other. In accordance with Criminal Rules of Practice, R. 3:21-8, you are entitled to no days credit. On the sixth count of Indictment SGJ 14-73-15 charging a restraint of trade in violation of the New Jersey Anti-trust Law, N.J.S.A. 56:9-3, you are fined the sum of $43,120. Said fine shall be paid to the Chief Probation Officer of Mercer County in a manner to be determined by him, and distributed by him in accordance with the provisions of N.J.S.A. 56: 9-19. This sum represents your average annual salary from Lawn King during the past five years.
I now turn to Lawn King, Inc., a New Jersey corporation.
Obviously, much of what I had said in sentencing Joseph Sandler also applies with equal force to the corporate defendant. However, there are several significant differences. First, the punishment cannot include incarceration. Second, the interdict of N.J.S.A. 56:9-16 does not apply, since its application is limited to individual defendants.
The purpose of this sentence will be to specifically deter Lawn King from violating the anti-trust laws in the future and to serve as a general deterrence to others. This can be accomplished by a substantial fine.
The presentence report in this matter indicates that the corporation did experience a rather substantial and dramatic increase in gross income in its early years. For instance, gross income increased from $61,709 in the fiscal year ending March 31, 1971 to $3,324,707 in the fiscal year ending March 31, 1975. In subsequent years gross income declined, undoubtedly due in part to the problems associated with this indictment. Net profits after taxes increased from $17,427 in the fiscal year ending March 31, 1971 to a high of $133,483 in the fiscal year ending March 31, 1973. It declined to $123,583 in the fiscal year ending March 31, 1974. *342 In subsequent fiscal periods the corporation sustained operating deficits.
A recent financial statement submitted to the court this morning was an unaudited statement of March 31, 1977  some five months ago  which indicated total assets of $1,231,811 and a stockholders' equity of $203,340, which included retained earnings of $178,340.
The corporation filed for bankruptcy sometime during October 1975. I have recently received letters from both Hugh M. Leonard, Esq., receiver for Lawn King, Inc., and John P. Croake, Esq., attorney for the receiver. The substance of both their letters is that a tentative Plan of Arrangement of Debtors has been consented to by a majority of the creditors, whose filed claims are in excess of $1,400,000; that a federal bankruptcy judge will hold a hearing on confirmation of the plan in three days, August 18; that the prospects for approval of the plan appear good, and that imposition of a "heavy fine" by this court may upset such a plan and lead to an adjudication of bankruptcy and liquidation.
They have also commented that a "heavy fine" (which they did not define) would adversely affect the future of the Lawn King, Inc., as well as have an adverse impact upon many Lawn King dealers who are presently operating throughout the country. Indeed, this court has received several letters from various dealers asking the court to be lenient in sentencing Lawn King because of the potential adverse effect it might have on such dealers.
I must take note of the fact that we are dealing with a situation where, as a result of an illegal scheme, substantial profits have been earned not only by Lawn King, but also by dealers and the creditors with whom Lawn King dealt. The identity of the creditors has not been disclosed to the court.
The court does not believe it unreasonable to suggest that any fine imposed by this court, if too great for Lawn King to pay at this time, could well be financed by such dealers *343 and creditors who have benefited from the restraint of trade violations committed by Lawn King. As said earlier, although subjected to some restraints, the dealers did profit financially from the scheme.
Obviously, in practically all, if not every, anti-trust case we are dealing with business organizations who in turn deal with other, and generally innocent, persons or corporations. The imposition of a substantial fine upon the anti-trust violator will always have some adverse impact upon those people and corporations with whom the violator has been doing business. But it would be unreasonable to expect the court to impose a minimal sentence upon the anti-trust violator solely for the purpose of not adversely affecting innocent parties who are dealing with the violator. It would make far more sense to ask such innocent parties, who have profited from restraint of trade violations, to assist the violator in paying the fine, if such be necessary. But this court does not think it necessary in this case.
For these reasons, as to the corporation, Lawn King, Inc., on the first, second and sixth counts of Indictment SGJ 14-73-15 charging restraints of trade in violation of the New Jersey Anti-trust Law, N.J.S.A. 56:9-3, it is sentenced on each count to a fine of $40,000, making total fines of $120,000 to be paid by Lawn King. Said fines shall be paid to the Chief Probation Officer of Mercer County in a manner to be determined by him, and distributed by him in accordance with the provisions of N.J.S.A. 56:9-19.
Both defendants, Lawn King, Inc. and Joseph Sandler, have a period of 45 days from today within which to file an appeal from this judgment. If either or both defendants claim to be indigent, and satisfy the court that such is the case, they have a right to appeal as an indigent and have the State pay the costs of the appeal.
In addition to informing defendants of the reasons for these sentences, I would hope that this opinion will contribute in some small fashion in attaining our goal of imposing uniform sentences, at least in anti-trust cases in this State.