169 N.J. Super. 346 (1979)
404 A.2d 1215
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LAWN KING, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND JOSEPH SANDLER, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 24, 1979.
Decided July 3, 1979.
*347 Before Judges HALPERN, ARD and ANTELL.
*348 Mr. John A. Craner argued the cause for appellants (Messrs. Craner and Nelson, attorneys; Ms. Elizabeth A. Truly on the brief).
Mr. Robert J. Clark and Ms. Laurel A. Price, Deputies Attorneys General, argued the cause for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Ms. Martha K. Kwitny, Deputy Attorney General, on the brief).
The opinion of the court was delivered by ANTELL, J.A.D.
Defendants appeal from their convictions under the first, second and sixth counts of an indictment charging multiple violations of the New Jersey Antitrust Act, N.J.S.A. 56:9-3. The judgment under review, entered after a nonjury trial, rests upon findings of vertical trade restraints in the form of price fixing, allocation of exclusive territories, tying arrangements, advertising restrictions and restraints upon alienation. It was within the context of dealer and distributor franchise arrangements for the furnishing of automated lawn care maintenance service to the public that the offending practices were found. Defendant Sandler was president and controlling stockholder of the corporate defendant, which functioned as franchisor, and the gist of the charges is that defendants illegally restrained competition between the franchisees.
The judgment below was accompanied by a formal opinion, reported at 150 N.J. Super. 204 (Law Div. 1977), and followed by another reported at 152 N.J. Super. 333 (Law Div. 1977), which comprehensively outline the circumstances of the case. We therefore find it unnecessary to restate the complex factual details, but instead incorporate them by reference to the opinions below.
Paramount among the grounds urged for reversal is defendants' contention that the trial judge erred in refusing to analyze the evidence under the "rule of reason" and by holding that the business behavior here questioned is illegal per se. They also urge that the findings and evidence are insufficient *349 to support his determination that defendants were guilty either of price fixing or tying arrangements, or to support his conclusion that defendants' advertising restrictions and restrictions upon resales of the franchises constituted unreasonable restraints of trade or commerce.
Our analysis begins with the statute under which the indictment was returned, N.J.S.A. 56:9-3, which provides:
Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful.
This section should be read together with N.J.S.A. 56:9-18, which states:
This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.
Also see Exxon Corp. v. Wagner, 154 N.J. Super. 538, 544 (App. Div. 1977).
In the federal jurisdiction it is settled that the comparable provision of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, does not embrace all restraints of trade. It prohibits only those which "unreasonably" curtail competition. Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Note, "Vertical Restraints  Legality of Non-price Vertical Restraints Determined Under Rule of Reason," 9 Seton Hall L. Rev. 496, 502 (1978). For guidance in application the United States Supreme Court adopted what is known as the rule of reason test. The most frequently cited statement thereof is the following by Justice Brandeis in Board of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918):
Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test *350 of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences. [246 U.S. at 238, 38 S.Ct. at 244]
Accord, White Motor Co. v. United States, 372 U.S. 253, 262, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).
Faced with the necessity of dealing with overwhelmingly complicated factual patterns, the court concluded that some business practices are per se violations. As it explained in Northern Pacific Ry. Co. v. United States, supra:
* * * there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable  an inquiry so often wholly fruitless when undertaken. [356 U.S. at 5, 78 S.Ct. at 518]
Refining this somewhat, the Court in United State v. Topco Associates, Inc., 405 U.S. 596, 607-608, 92 S.Ct. 1126, *351 1133, 31 L.Ed.2d 515 (1972), commented that "It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act." Elsewhere it has been observed, "The usual assumption is that a per se rule would grow out of a history of rule of reason cases all arriving at the same verdict." Northwest Power Products, Inc. v. Omark Industries Inc., 576 F.2d 83, 88 (5 Cir.1978), cert. den. 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). Only after careful and deliberate study have the federal courts over the years classified certain forms of business behavior as illegal per se.
The applicable judicial methodology is demonstrated in the following passage from Kentucky Fried Chicken v. Diversified Packaging, 549 F.2d 368 (5 Cir.1977), wherein the court weighed the factors appropriate for determining whether the per se rule should be applied to "approved source" requirements in franchise agreements.
When we turn from tying to approved-source requirements, however, the situation is somewhat different. The threat that franchisors will abandon franchising does not affect us, but the potential pro-competitive effects of franchising lead us to proceed cautiously lest we unduly shackle franchisors without achieving discernible competitive benefits. We must encourage business ingenuity so long as it is not competitively stifling. We deal here not with tie-ins, whose adverse effects and lack of redeeming virtue are by now quite familiar, but instead with approved-source requirements. When we become more familiar with large-scale franchising and with approved-source requirements, we may discern that the latter are wholly unnecessary to the former. Indeed, we may one day learn that approved-source requirements are consistently hurtful of competition or that sorting the anti-competitive provisions from the innocuous ones is a task too elusive or time consuming to warrant the effort. It will be time enough, however, to declare such requirements to be per se violations when that day arrives. It is enough to decide today's cases today and have future cases to the wisdom and experience of future years. Economic decisions derive from contemporary economic analysis. [at 379-380]
In determining whether per se rules are appropriate because of "manifestly anticompetitive" effects, Continental *352 T.V. Inc. v. GTE Sylvania Inc., supra, 97 S.Ct. at 2558, signal regard is often given to whether a particular restraint is horizontal or vertical. The former occurs among competitors at the same level of market structure, whereas the latter involves combinations of business organizations at different levels. United States v. Topco Associates, Inc. supra, 405 U.S. at 608, 92 S.Ct. 1126. Horizontal restraints are regarded as "classic examples" of per se violations. Id. They "are naked restraints of trade with no purpose except stifling of competition." White Motor Company v. United States, supra, 372 U.S. at 263, 83 S.Ct. at 702. On the other hand,
A vertical territorial limitation may or may not have that purpose or effect. We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business * * * and within the "rule of reason." We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack * * * any redeeming virtue" * * * and therefore should be classified as per se violations of the Sherman Act. [Ibid.]
The trial judge, in applying the per se rule of illegality to the vertical restraints here involved, relied on United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). That case broadly applied the per se rule of illegality to vertical restrictions, interrupting the dominance of the rule of reason. Pitofsky, "The Sylvania Case: Antitrust Analysis of Non-Price Vertical Restrictions," 78 Colum. L. Rev. 1, 6 (1978). However, in Continental T.V., Inc. v. GTE Sylvania Inc., supra, a case involving the allocation of exclusive territories, the Supreme Court expressly overruled Schwinn and returned to the rule of reason standards articulated in White Motor Co. v. United States, supra, and Northern Pacific Ry. Co. v. United States, supra. Note "Vertical Restraints  Legality of Non-price Vertical Restraints Determined Under Rule of Reason," *353 supra at 516, 521. The same position has since been taken in cases involving price restrictions. Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., ___ U.S. ___, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc., 572 F.2d 883 (1 Cir.1978). And, in Kentucky Fried Chicken v. Diversified Packaging, supra, 549 F.2d at 380, it was held that "approved-source" requirements of the kind which are described in the opinion below at 150 N.J. Super. at 236, and which form the basis of the tying arrangement charge in this case are not subject to the rule of per se illegality.
Although the trial judge decided this case prior to the announcement of Continental T.V. Inc. v. GTE Sylvania Inc., supra, this decision was brought to its attention in defendants' motion for post-trial relief. Regardless, we, as an appellate court, are obliged to apply the law as it exists when we render our decision. Eastern Scientific Co. v. Wild Heerbrugg, etc., supra, 572 F.2d at 885; Busik v. Levine, 63 N.J. 351, 361 (1973).
The principle which we must therefore apply is that although particular forms of vertical restraints might justify per se prohibition, it is "clear that departure from the rule of reason standard must be based upon demonstrable economic effect rather than  as in Schwinn  upon formalistic line drawing." Sylvania, supra, 97 S.Ct. at 2562.
In the present case there has been no showing that the vertical restrictions have or are likely to have a "pernicious effect on competition" or that they "lack * * * any redeeming virtue." Vertical restrictions are, in fact, frequently utilized to achieve marketing efficiencies which actually promote competition, and the vice of the per se rule as formulated in Schwinn, supra, is that it rigidly prohibited many such beneficial practices.
Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. These "redeeming virtues" are implicit in every decision *354 sustaining vertical restrictions under the rule of reason. Economists have identified a number of ways in which manufacturers can use such restrictions to compete more effectively against other manufacturers. See, e.g., Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards, 30 Law & Contemp. Prob. 506, 511 (1965). For example, new manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products, such as automobiles and major household appliances. The availability and quality of such services affect a manufacturer's good will and the competitiveness of his product. Because of market imperfections such as the so-called "free rider" effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did. Posner, supra, n. 13, at 285; cf. P. Samuelson, Economics 506-507 (10th ed. 1976).
Economists also have argued that manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products. Bork, The Rule of Reason and the Per Se Concept: Price Fixing and the Market Division II, 75 Yale L.J. 373, 403 (1966); Posner, supra. n. 13, at 283, 287-288.

[Sylvania, supra, 97 S.Ct. at 2560-61]
Similar considerations emerge from the franchise agreements before us. While they may restrict competition among the franchisees, their overall effect may have been to strengthen the franchisees' competitive positions as against rival organizations and thereby stimulate competition on a wider plane. The circumstances required a sensitive weighing of pro-competitive against anti-competitive effects resulting from defendants' behavior, and patterns of analysis are suggested by the foregoing excerpted language of Sylvania.[1]
*355 Few will disagree that the franchise system through which defendants carry on their activities has its share of problems. But those on which the trial judge primarily focused, such as inequities arising from wrongful revocation, or the threat thereof, others flowing from the unequal bargaining positions of franchisor and franchisee and, in the trial judge's view, a resultingly unfair allocation of benefits and burdens, are of only peripheral concern to a rule of reason antitrust analysis[2]. Of greater importance is the need for sound insight into the form of business enterprise under study, in this case the franchise system of distributing goods and services. For
* * * apart from abuses of the system, significant advantages  both economic and social  are perceived to flow from the franchise system of distribution. Franchising is said to: (1) provide opportunity for individuals, including persons of modest means, to go into business for themselves; (2) decrease the risk of failure of individual businesses; (3) decrease economic concentration by providing an alternative to vertical integration of business; and (4) benefit consumers by providing standardized products to an increasingly mobile public. Hunt, The Socioeconomic Consequences of the Franchise System of Distribution, 36 Journal of Marketing 32, 33-35 (1972).

* * * * * * * *
We do not imagine many persons are, in any meaningful sense, forced to enter into franchise agreements. It may be that some do so because they have been deceived as to the terms, or the potential profitability, of the franchise; it may be that others do so because they lack sophistication and do not understand or appreciate the details of the bargain. More realistically, we would expect to find that an arrangement apparently reasonable at its inception begins to seem burdensome to the franchisee as the business is successfully established. Only from the successful business can the franchisor effectively seek a continuing return on investment; yet as the venture prospers, the franchisee, in time, may come to regard the arrangement as onerous, restricting his profitability. Viewed this way, it is apparent *356 that the underlying issues are economic as much as legal. What price may a franchisor properly demand for its "product"? By what means may it properly exact that price? [Ungar v. Dunkin' Donuts of America, Inc., 531 F.2d 1211, 1222-1223 (3 Cir.), cert. den. 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976)]
The nature of the franchise business structure is especially germane to the reasonableness of the territorial restrictions. Their purpose obviously is to protect those franchisees who invest time, money and effort in promoting the Lawn King name and logo in a geographical area since there would be no incentive for this if it could be freely exploited by a competing franchisee who is also licensed to use the same name and logo. This is all part "of the economic and business stuff out of which these arrangements emerge," White Motor Co. v. United States, supra, 372 U.S. at 263, 83 S.Ct. 696, about which more must be known before determining that their impact upon a free market economy is, as the State charges, unreasonably restrictive.
In his finding that defendants were guilty of a tying arrangement which was illegal per se, the trial judge again failed to apply the analytical process required. A tie is an arrangement in which a seller agrees to sell one product (the "tying product") only on the condition that the buyer also purchases a second product (the "tied product"). Kentucky Fried Chicken v. Diversified Packaging, supra, 549 F.2d at 375. Clearly, rule of reason analysis in this case was indicated. The supposedly tied products consisted of chemicals and other lawn care material such as seeds and fertilizer, the very material the franchisees use in supplying their service. Yet nowhere in its proofs did the State attempt to show the unreasonableness of these efforts by defendants to insure quality control and provide the franchisees with supplies at lower cost bulk rates.
Unlike that of the tying party in a prototypal tying case, a franchisor's own success may depend in large measure on the success of the tie's "victim", the franchisee. The franchisor will succeed only by establishing a favorable reputation among the consuming public, *357 and in building that reputation the franchisor must depend largely on the quality of the franchisee's performance. A franchisor will rarely have an opportunity to explain to a dissatisfied customer that the fault was only that of the particular franchisee. The franchisor may therefore have legitimate as well as illegitimate reason for restraining the franchisee's choices in the tied product market. The tie may have a benevolent or malevolent loop. Although in the archetypal case "[t]ying arrangements serve hardly any purpose beyond the suppression of competition", Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), in the franchising context ties may well serve acceptable purposes. [Kentucky Fried Chicken v. Diversified Packaging, supra, 549 F.2d at 375-376]
Additionally, Lawn King's franchise agreements actually did not provide for tie-ins; they authorized purchases from approved sources and for this further reason were not illegal per se. Id at 380.
As detailed in the opinion below, an illegal practice in restraint of trade was found in the defendants' advertising program whereunder the franchisees were required to support wide-scale advertising of the Lawn King name and logo without individually identifying the franchisees, and in the contractual requirement that Lawn King, as franchisor, should have the right of first refusal in the event a franchisee chose to sell its franchise. For reasons given earlier in this opinion, neither of these practices are illegal per se; nor can we discern how, under any circumstances, they could produce a restraint of trade in the statutory sense. Furthermore, the obligations were freely contracted, and although they imposed certain burdens on the franchisees, their purpose was to enhance and protect the Lawn King image to the ultimate benefit of franchisor and franchisee alike.
It has not been overlooked that although the trial judge applied a per se theory of criminality to the evidence before him, he nevertheless received and considered defendants' evidence of proffered business justifications for the restraints of the kind which would ordinarily receive attention in a rule of reason study. However, by erroneously characterizing the restraints in the first instance as illegal per se, he had already *358 relieved the State from demonstrating by independent evidence the anti-competitive impact of defendants' behavior. The effect of this was to shift the burden of this issue to defendants, and incorrectly require them to justify conduct which had nowhere been demonstrated wrongful in the evidence.
We are in agreement with defendants' contention that the record does not support the trial judges finding of coercive price fixing. At most the underlying factual findings demonstrate that defendant Sandler adamantly refused to acquiesce in any modification of a recommended lawn maintenance rate of three cents a square foot. That, together with the fact that franchisees adhered to the recommended or suggested price, came within the limits allowed by United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), which recognizes the right of a manufacturer "freely to exercise his own independent discretion as to parties with whom he will deal". At 307, 39 S.Ct. at 468. The findings made do not demonstrate that defendants secured adherence by the franchisees to suggested prices by means which go beyond "mere declination to sell to a customer who will not observe [their] announced policy." Cf. United States v. Parke Davis & Co., 362 U.S. 29, 43, 80 S.Ct. 503, 4 L.Ed.2d 505, 511 (1960). What were described by the trial judge as coercive methods of price maintenance, although frequently imperious in manner, did not exceed the permitted bounds of "exposition, persuasion and argument." See Gray v. Shell Oil Co., 469 F.2d 742, 748 (9 Cir.), cert. den. 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1972). Our attention has been drawn to no instance in which defendants caused harm to any franchise for failure to maintain price.
It is noted that in finding defendants guilty of price fixing the trial judge placed particular reliance upon the following statement which he characterized as an "admission" made by defendant Sandler during a taped conversation with the State's witness, Teitlebaum:
*359 * * * Listen to what I'm saying. I have the right to say what type of advertising is done, what kind of advertising is done, what kind of trailer you use, what kind of trucks you use, which chemicals you use, what price you charge. Okay? The only thing that they can get me on, but I'll tip you off to what it is, is price fixing. [150 N.J. Super. at 226]
Disregarded by the trial judge was the exchange which followed immediately after and which is essential to an understanding of what was meant:

 Teitlebaum: Naturally.
 Sandler: This is what I'm saying. Only if they can prove that I'm in
 cahoots with another one of our competitors, and you know
 better than that.
 Teitlebaum: Of course I do.
 Sandler: That I have gotten together with them to fix the price.

Read in context we cannot fairly attribute to the words relied on the meaning given by the judge. They should not have been so completely excised from their context. 31A C.J.S. § 377 (1964). Taking his statement in its entirety, we understand that defendant is perhaps saying that, unlike other things which he is free to do, he has no right to fix prices, and if he did, "they can get" him. But that he denies engaging in this practice is free of doubt.
The trial judge expressly found that the State presented no independent evidence to prove the alleged restraints of trade (150 N.J. Super. 223), relying entirely upon the theory that defendants' business practices were per se illegal. Since the per se rule was inapplicable to defendants' business behavior, we conclude that there was no basis upon which to rest a verdict of guilt which had to be established beyond a reasonable doubt. Accordingly, the judgments of conviction under the first, second and sixth counts of the indictment are reversed and judgments of acquittal entered. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
NOTES
[1] The State's argument that the arrangements here entered were in fact horizontal in nature and not vertical is unpersuasive. Reliance for its contention is placed on United States v. Topco Associates, Inc., supra, and United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). In both of these cases defendants were corporations created and operated only as vehicles through which their stockholders carried on clearly anticompetitive horizontal business practices. Lawn King's position with respect to its franchisees is in no way comparable.
[2] Many of these are regulated by the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 et seq.