207 N.J. Super. 350 (1985)
504 A.2d 160
STATE OF NEW JERSEY, PLAINTIFF,
v.
GARY ROSENBERGER, DEFENDANT.
Superior Court of New Jersey, Law Division Somerset County.
November 7, 1985.
*351 Craig L. Barto for plaintiff (Nicholas L. Bissell, Jr., Prosecutor of Somerset County, Attorney).
Bernard F. Conway, for defendant (Stern, Steiger, Croland & Conway, Attorneys).
IMBRIANI, J.S.C.
When sentencing a white collar criminal the "hard" question that invariably arises is whether or not to incarcerate. Defendant is usually viewed as a decent, non-violent person and generally incarceration has been eschewed and an alternative sentence imposed.
However, of late, some courts have questioned the efficacy of this approach and are beginning to inquire into the goals to be attained by the sentence and how best to accomplish them. See, e.g., United States v. Buettner-Janusch, 534 F. Supp. 655 (S.D.N.Y. 1982); United States v. Krutschewski, 509 F. Supp. 1186 (D.Mass. 1981). Astonishingly, although a frequent task, there is a dearth of sentencing opinions. And those, that have been published, generally only state the reasons for imposing a particular sentence, without explaining why an alternative sentence *352 was rejected, perhaps because a court is not required "to state explicitly why it has rejected alternatives to incarceration." Black v. Romano, ___ U.S. ___, 105 S.Ct. 2254, 2257, 85 L.Ed.2d 636 (1985).
Prior to the adoption of our new Criminal Code on September 1, 1979 the:
dominant sentencing ideology stressed two themes: rehabilitation and prediction of future criminality. The judge was supposed to fashion the sentence to promote the offender's resocialization. The sentence also was supposed to reflect the likelihood of the offender's offending again. [State v. Roth, 95 N.J. 334, 346 (1984)]
However, studies disclosed "clinical evidence that the prevailing theory of rehabilitation simply did not work [and] ... led irrevocably to the conclusion that the criminal justice system had no idea how to rehabilitate offenders and reduce recidivism". Id. at 348. And once this determination became clear there "emerged something of a consensus that the root cause of crime is the criminal ... [and] empathy for the felonious few ... has resulted in cruelty to the ... many." "Federal Criminal Sentencing Policy," Congressional Digest (June-July, 1984) at 163.
After extensive studies the Legislature concluded that "the theory of rehabilitation should be abandoned as a primary justification for the nature and length of sentences," State v. Roth, supra at 349, and it adopted the new Criminal Code which clearly enunciated as its "paramount sentencing goal that punishment fit the crime not the criminal." State v. Yarbough, 100 N.J. 627 (1985). In short the sentence must be based upon the crime and not oriented to the criminal.
This is not to suggest that, previously, rehabilitation was our sole concern. Incarceration was imposed "[i]f the offense has strong emotional roots or is an isolated event unassociated with a pressing public problem," State v. Ivan, 33 N.J. 197, 202 (1960) (a bookmaking case), or when to do otherwise would bring "the criminal law into disrepute by appearing to depreciate the magnitude of the offense." State v. Leggeadrini, 75 *353 N.J. 150, 163 (1977) (7-10 years imprisonment imposed upon a 66-year-old retired man with no prior criminal record and an excellent 31-year work record for fatally shooting a neighbor in an argument over damage to defendant's property caused by victim's ballplaying). But these were the exceptions.
White collar crimes generally present a fairly uniform fact pattern. Defendants usually have no prior criminal record (not even an arrest), no propensity for recidivism, occupy respectable positions in business, are mature adults, served in the military service and are apparently happily married. This defendant fits squarely within that scenario.
He admitted pilfering two checks of his employer, AT & T, made payable to an alleged vendor, one for $175,000 on July 9, 1984 and another for $200,000 on September 7, 1984 which he deposited into a checking account he controlled and used for his personal purposes. He pled guilty to a third degree offense of theft, in violation of N.J.S.A. 2C:20-3, and two fourth degree offenses of forgery, in violation of N.J.S.A. 2C:21-1(a)(2).
The court has decided to incarcerate defendant and will attempt to explain why it does so and why it rejects alternative sentences. Judges are well aware of the factors to be considered when imposing a sentence, but what is lacking is:
information advising them how to balance the factors or how much emphasis is to be put on any one factor vis a vis the others. [Report of the Sentencing Guidelines Project to the Administrative Director of the Courts for the State of New Jersey (November, 1978) at 2.]
Bereft of guidelines and precedent a judge must perforce resort to his own predilections, experiences and personal value system. And it is obvious that such a system will necessarily result in sentencing disparity because judges are left "wandering in deserts of uncharged discretion" causing them to impose "their own value systems insofar as they think about the problems at all". Frankel Criminal Sentences, (1972) at 7-8.
The judge is likely to read thick briefs, hear oral argument, and then take days or weeks to decide who breached a contract for delivery of onions. The same judge will read a presentence report, perhaps talk to a probation officer, hear a *354 few minutes of pleas for mercy  invest, in sum, less than an hour in all  before imposing a sentence of ten years in prison. [Id. at 15]
While a first-time offender convicted of third and fourth degree offenses is entitled to the presumption of a non-custodial sentence, N.J.S.A. 2C:44-le, the sentencing judge may incarcerate if justified by a review of the nature and circumstances of the offense and the aggravating circumstances enunciated in N.J.S.A. 2C:44-1a. See State v. Hess, 198 N.J. Super. 322 (App. Div. 1984) (sustaining 30-day jail sentence as a condition of probation for a third degree offense); State v. Casele, 198 N.J. Super. 462 (App.Div. 1985) (upholding an eighteen month sentence in prison with four months parole ineligibility for a fourth degree offense). Moreover, the presumption of non-incarceration is not applicable in this case because the plea agreement provided that there shall be no presumption either in favor of or against incarceration. This was apparently agreed upon because the State downgraded the theft offense from a second degree to a third degree offense.
White collar crimes are non-violent offenses which involve deceit, corruption or a breach of trust and are frequently committed by educated and intelligent individuals. Unlike other criminals (frequently described as street criminals) who generally act on impulse or due to a lack of insight or sense of responsibility, the white collar criminal acts willfully with premeditation, perspicacity and deliberation to consciously disobey the law. There is one dominant reason for committing the offense  GREED.
Contrary to what has been asserted by some, this is not a victimless crime. Economic crimes have an enormous, although frequently unappreciated, impact on society.
The U.S. Chamber of Commerce estimated in 1974 that white collar crime costs the nation at least $40 billion each year ... [which] is 200 times the amount stolen by all the country's bank robbers in 1974. [The Bureau of National Affairs, Inc., White Collar Justice (April 13, 1976) at 3]
A recent economic crime project conducted by the National District Attorney Association estimated that in 1984 the loss *355 escalated to $65 billion. However, no one really knows their full extent since they are usually cleverly designed and carefully concealed. Clearly, we are in the midst of an economic crime wave the likes of which we have never seen in America. And who pays the costs? Certainly not industry or business, because we know the costs are passed on to consumers. Obviously the victim of Rosenberger's crime is not AT & T, but the thousands and millions of telephone users who must all pay higher telephone bills because of the defalcation of criminals like him.
Defendant has cooperated fully with the authorities. He liquidated all of his assets and realized $252,000 which he gave to AT & T, as well as a promissory note for the balance of $123,000, payable $1,354.34 monthly at 12% interest with a balloon payment of $114,199.36 due on July 1, 1990. After AT & T fired him he moved to California where, surprisingly, within a few months, he quickly secured an excellent and comparable position with IBM at an annual salary of $55,000, plus bonuses and incentives. The court has received many letters on behalf of defendant urging leniency and probation, including one from the attorney for AT & T.
It is generally agreed that the purposes or aims of sentencing should include at least the following: (1) retribution, (2) rehabilitation, (3) isolation of defendant for the protection of society, (4) punishment and (5) deterrence of others. See State v. Ivan, supra, 33 N.J. at 199.
This court is satisfied that no useful purpose would be served by retribution, and that there is no need to rehabilitate defendant or isolate him to protect society. Defendant is intelligent, knowledgeable and knew precisely what he was doing. There is nothing that society can teach him about the illegality of his conduct. Moreover, I am satisfied that the likelihood of recidivism is minimal which negates the need to isolate him for the protection of society.
*356 In this court's opinion the goals to be attained when sentencing a white collar criminal are two-fold: (1) to punish defendant, and (2) to deter similar conduct by others. While some have questioned the vitality of deterrence, this court is convinced that if the imposition of stiff sentences are widely disseminated by the media (as is the practice) knowledgeable and educated citizens (the white collar criminals) will take cognizance of stern punishment and some, although admittedly not all, will be deterred from violating the law. To believe otherwise would discredit and disparage our system of justice.
There are a number of methods that have been employed by courts to punish and/or deter white collar criminals. A brief discussion of each follows:
1. HE HAS SUFFERED ENOUGH. Some say that the shame and disgrace as a convicted felon is sufficient punishment and anything more would constitute punitive retribution. Why this philosophy should be applied to a first time thief or embezzler but not a first time murderer or armed robber is not clear. Nonetheless, the facts here are barren of evidence that this defendant has suffered; indeed, the evidence is to the contrary. He had minimal roots anywhere and lived in Bound Brook for only two years prior to this offense. After being fired by AT & T he moved to California and quickly obtained a new and equally lucrative position. There is no evidence that he is now shunned socially, financially or otherwise. He still earns as much as he did at AT & T and it is probable that his new neighbors are totally unaware of his criminal conduct. So where is the shame? With whom has he been disgraced? How has he been punished? It is apparent that he simply moved his employment and residence 3,000 miles and continued his same life style without so much as a hitch.
2. USE HIS SKILLS TO HELP OTHERS. This argument posits that white collar criminals should be punished by compelling them to donate their skills to others. If a lawyer, have him give free legal advice; if a doctor, free medical aid; if a *357 salesman, free lectures on how to sell, etc. The fallacy of this argument is that it unwittingly creates a two-tiered system of justice, one for the intelligent and educated, and another for the nescient and undereducated. The white collar criminal invariably would enjoy the benefits of alternative sentencing and be sentenced to community service while the street criminal would go to prison. Apart from its patent and perhaps even unconstitutional unfairness, it is difficult to believe that such a sentence, although constituting some facial punishment, would have any genuine deterrent effect, especially when the amount of the theft is significant.
3. HIT HIM IN THE POCKETBOOK. Some argue that the best way to deter this type of crime is to strip defendant of his ill-gotten gains. The punishment would consist not only of full restitution, but also a substantial fine. Presumably, such persons would be deterred if they realized that upon conviction they would lose not only what they stole, but a good share of their personal assets. This theory has at least two flaws. First, it again espouses a two-tiered criminal justice system which asserts that the wealthy pay fines, but the poor go to jail. Second, it cannot be applied where, as here, defendant doesn't have sufficient funds to pay a fine, much less make full restitution. How can you hit someone in the pocketbook if it is empty? And if it is suggested that we accept a promissory note, then why not do so with a contrite bank robber? While this method of punishment has some facial appeal it leaves more questions unanswered than it answers.
4. INCARCERATE. Some say that the only realistic punishment and true deterrent is imprisonment. This type of criminal is more conversant with the media and is more apt to be aware of the potentiality of imprisonment. And, unlike many street criminals, the white collar criminal has a strong fear of incarceration. Many believe that if they are treated as criminals and not as "good guys" who could be "our next door neighbors," white collar crimes would diminish. While it is true that incarceration will result in some increased immediate costs *358 to society, if it is an effective deterrent, it is reasonably arguable that society would realize significant long term benefits and monetary savings.
Understandably, criminal defense experts seek to divert attention from the crime and entreat defense counsel:
to emphasize the degree to which your client has already been punished. Your job is to present to the court a "person" rather than a "convicted man". Judges often are lenient with an individual whose humanity is brought home in a personal way. [Bailey and Rothblatt, Defending Business and White Collar Crimes (2 ed. 1984) at 398]
If our purpose is solely to punish defendant one could conclude that incarceration is unnecessary and perhaps even punitive because it could be said that defendant has suffered enough, has a skill society could utilize, and has suffered financially. But hasn't the Legislature made it abundantly clear that the sentence should "focus upon the gravity of the offense and not the blameworthiness of the offender"? State v. Roth, supra, 95 N.J. at 355.
On the other hand, if our major purpose is deterrence, one could argue with great cogency that white collar criminals will not be deterred if they are assured that upon conviction their only punishment would be shame, or teaching their skills to others, or suffering some financial loss. Indeed, if that is the only punishment meted out, in addition to those who would be outright thieves and pocket all of their ill-gotten gains, how many more will be tempted to commit such an offense with the intention, not to be a thief, but simply to "borrow" the money for a few weeks or months to make a killing on a hot tip in the stock market or in some gambling venture?
The dominant purpose in the sentence of a white collar criminal must be deterrence and to do so "a sentence must have some sting and hurt." State v. Lawn King, 152 N.J. Super. 333, 340 (Law Div. 1977), rev'd on other grounds 169 N.J. Super. 346 (App. Div. 1979), aff'd 84 N.J. 179 (1980). The only realistic method of doing so is incarceration. Anything less would not only deprecate the seriousness of this crime but would be ineffective *359 to achieve the aim of the sentence and suggest that commercial and financial crimes committed by the intelligent and well-educated are not really crimes but something akin to a civil wrong. To incarcerate the nescient and under-educated for stealing less than $100 and place this defendant on probation for the theft of $375,000 would constitute a gross miscarriage of justice and be tantamount to condoning his illegal activity. Moreover, an alternative sentence would implicitly reject the mandate of our new Criminal Code that requires "the punishment fit the crime, and not the criminal." State v. Hodge, 95 N.J. 369, 375 (1984).
The facts in this case do not bespeak leniency. Defendant was not suffering from any psychosis or mental illness, the sum stolen was significant ($375,000), the theft did not occur on impulse during a single episode but involved two large checks cashed two months apart, and a significant sum ($123,000) remains unpaid without any explanation of where it is, or, if spent, how, when and why.
We must shed ourselves of the perception that white collar criminals are "good guys" who are "too good to be in jail," "Comments: Alternative Sentencing or Part-Time Imprisonment is Discriminatory," 26 How.L.J. 1265 (1983), because we have unwittingly created an unconstitutionally privileged criminal class who receive preferential treatment. For example, in 1976, 91% of all bank robbers were incarcerated for an average of 11 years while 17% of embezzlers were incarcerated for an average of under two years. See Business Week (June 13, 1977) at 66, 71.
The court is satisfied that the nature and circumstances of the offense are so great as to compel the imposition of a custodial sentence. Moreover, a review of N.J.S.A. 2C:44-1a indicates several aggravating circumstances, to wit: "(4) ... the defendant took advantage of a position of trust or confidence to commit the offense; [and] ... (9) the need for deterring the defendant and others from violating the law."
*360 Accordingly, an alternative sentence is rejected as being inadequate deterrence and defendant is sentenced to three years in state prison on the third degree offense of theft, and eighteen months in state prison on each of the fourth degree offenses of forgery, all to run concurrently with each other.