STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. LAWN KING, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND JOSEPH SANDLER, DEFENDANTS-RESPONDENTS.

Argued February 20, 1980—Decided July 31, 1980.

*Laurel A. Price* and *Robert J. Clark,* Deputy Attorneys General, argued the cause for appellant (*John J. Degnan,* Attorney General of New Jersey, attorney; *Robert J. Clark, Laurel A. Price and Edwin H. Stern,* Deputy Attorneys General, on the brief).

*John A. Craner* argued the cause for respondents (*Craner and Nelson,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This appeal raises important issues of first impression for this Court. Involved are allegations of illegal restraints of trade in the operation of a franchise business in violation of the New Jersey Antitrust Act, *N.J.S.A.* 56:9–1 *et seq.* (*L.*1970, *c.* 73). The trial court convicted and sentenced both the corporate defendant and the individual defendant on several counts of the indictment thereunder. The Appellate Division reversed all convictions and entered judgments of acquittal. We now affirm these judgments of acquittal.

## I

Defendants are Lawn King, Inc. (Lawn King), a New Jersey corporation organized in August 1970, and Joseph Sandler, the president and chief operating officer of Lawn King and owner of ninety-five percent of the corporation's common stock. The corporation presently operates as a business structured under the Franchise Practices Act, *N.J.S.A.* 56:10–1 *et seq.* (*L.*1971, *c.* 356). See *Finlay & Associates, Inc. v. Borg-Warner Corp.,* 146 *N.J.Super.* 210, 215–221 (Law Div. 1976), aff'd o.b. 155 *N.J.Super.* 331 (App.Div.1978), certif. den. 77 *N.J.* 467 (1978). It functions at the apex of a pyramidal, three-tier distribution system which provides lawn care to individual customers through Lawn King dealers. The intermediaries between Lawn King and its dealers are the Lawn King distributors. Each Lawn King dealer and distributor holds a franchise from the franchisor corporation. These franchises sold by Lawn King to

the distributors and the dealers are territorial, with the distributorship franchises being county-wide and the dealership franchises covering part or all of one of more municipalities. Thus, each distributor serves several dealers.

The provisions of the franchise contracts form the basis of most of the antitrust charges here involved. Under the Dealer Franchise Agreement in use at the times relevant hereto,[1] each dealer was granted for a renewable period of five years the exclusive rights to sell Lawn King services and products to individual customers within specified geographic boundaries (each area contained a minimum of 6,000 "operable" lawns). Lawn King, the dealers' franchisor, agreed pursuant to these agreements (1) to lend to each dealer a Lawn King combine, a tractor-drawn machine which in a single operation aerates the lawn, deposits designated amounts and types of chemicals and seed, and rolls the lawn; (2) either to sell to the dealer the seeds, chemicals, and fertilizers necessary to the business or to provide the dealer with "approved sources" from which to purchase such items; (3) to sell or lease to the dealer a modified farm-type tractor and any other equipment, excluding the combine, for use in the business; (4) to permit the dealer to use the registered Lawn King trade name and service mark or logo;[2] (5) to supply the dealer with one copy of the Lawn King Operating Manual; (6) to arrange advertising and promotional programs for the dealers' benefit; (7) to furnish newsletters, bulletins, and advertising materials as well as an initial supply of stationery and business forms; (8) to train the dealer and assist him or her in both selecting a location and setting up the dealership; (9) to arrange for national and regional sales meetings; (10) to main-

---

[1]Two different Dealer Franchise Agreements were actually utilized during this period. Any differences between the two versions, however, are not relevant here and the two forms will be treated hereinafter as one. See *post* at 209.

[2]The Lawn King service mark was registered for a term of twenty years with the United States Patent Office on January 23, 1973 (Principal Register No. 951,517). The registration form notes that this service mark was first used by Lawn King in September 1970.

tain a dealer advisory service in its home office, and (11) to appoint a distributor to operate as an intermediary between the corporation and several dealers and thus to assist in the performance of many of these enumerated items.

In return, under the Dealer Franchise Agreements, the franchise dealer agreed (1) to pay Lawn King $12,500 plus a weekly franchise fee of ten percent of the dealer's gross revenues for that week; (2) to provide Lawn King with a weekly revenue report; (3) to participate with other dealers in a particular region in cooperative advertising ventures, paying in proportion to the circulation of the particular advertising medium within the dealership area; (4) to purchase from Lawn King a carry-all trailer and a modified farm-type tractor for use in the business and to use only that equipment or company-approved substitutes; (5) to borrow from the corporation a lawn service combine and to use only that combine in servicing the lawns; (6) to confine sales and services to the limited geographic area for which the franchise was granted; (7) to purchase all seeds, chemicals, fertilizers, and other supplies only from a Lawn King distributor or from an "approved source"; (8) to meet quality standards and maintain a uniform image; (9) to use and display the Lawn King trademark and service mark or logo in accordance with company instruction; (10) to maintain specified amounts of liability insurance; (11) to employ only corporation-approved advertising formats, concepts, and systems, and (12) to abide by the general operating procedures of the corporation. Each Dealer Franchise Agreement also contained a fixed series of "additional terms" attached thereto; these included (1) a restrictive covenant as to the dealer's subsequent employment upon termination of the franchise; (2) a right of first refusal by the corporation if the dealer should decide to transfer the franchise; (3) provisions regarding franchise termination procedures, and (4) a reaffirmation that the nature of the relationship between Lawn King and the dealer is that of franchisor-franchisee. At the time of the indictment, there were 154 such dealer franchises in operation, 58 in New Jersey and 96 in other states.

The Distributor Franchise Agreement was similar in format. Thus, a distributorship franchise was assigned a renewable five-year exclusive franchise to conduct a business under the Lawn King name within a specified territory, usually a county, in consideration for payment of an "Activity Guarantee Fee" of $10,000. The functions of a distributorship consisted, according to the agreements, of (1) advertising for, negotiating and consummating sales of franchises to prospective dealers; (2) assisting dealers with selecting locations and with initially establishing the dealerships; (3) planning dealers' initial advertising; (4) purchasing seeds and chemicals from Lawn King or from approved sources for resale to dealers; (5) performing quality control inspections of dealerships; (6) enforcing the provisions of the Dealer Franchise Agreements; (7) organizing the cooperative media advertising within the distributorship territory; (8) maintaining a "Showcase" dealership,[3] and (9) meeting a quota for dealer franchises established within the distributorship territory. For these efforts, each distributor received as remuneration 25% of Lawn King's 10% weekly franchise fee collected from each dealer within the distributor's territory, $750 for each franchise established within the distributor's territory, and a mark-up of 20% on the distributor's sales of chemicals and seeds to dealers. A list of additional terms similar to those contained in the Dealer Franchise Agreements was also appended to each Distributor Franchise Agreement.

On June 15, 1973, a State Grand Jury returned a multiple-count indictment charging Lawn King and Joseph Sandler with several restraints of trade in violation of Section 3 of the State Antitrust Act (*N.J.S.A.* 56:9–3).[4] Count I alleged various vertical restraints; Count II essentially tracked Count I but alleged that these practices constituted illegal horizontal trade restraints; Counts III through VI alleged various illegal tying

---

[3]Thus, every distributor was also a dealer.

[4]This section provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." *N.J.S.A.* 56:9–3.

arrangements, and Count VII alleged an illegal conspiracy among Lawn King, its distributors, and a supplier to restrict access of Lawn King dealers to chemicals and seeds.

The trial court, in a reported opinion, 150 *N.J.Super.* 204 (Law Div. 1977), after initially finding that the State Antitrust Act, *N.J.S.A.* 56:9–1 *et seq.*, was not preempted by the federal Sherman Antitrust Act, 15 *U.S.C.A.* §§ 1–7, 150 *N.J.Super.* at 217–220, determined that the proper test or standard to apply in determining the illegality of the alleged restraints of trade was the *per se* rule, relying *inter alia* on *United States v. Arnold, Schwinn & Co.*, 388 *U.S.* 365, 87 *S.Ct.* 1856, 18 *L.Ed.2d* 1249 (1967). 150 *N.J.Super.* at 224. The court then proceeded to find both defendants guilty of the following restraints of trade in violation of the State Antitrust Act: (1) price-fixing or resale price maintenance, *i. e.*, requiring Lawn King dealers to offer their services at a fixed or designated price (Counts I and II), *id.* at 227; (2) territorial restrictions, *i. e.*, prohibiting the dealers from selling Lawn King goods or services outside of their franchise areas (Counts I and II), *id.* at 230; (3) an illegal tying arrangement by which dealers were required to purchase necessary seeds and chemicals either from Lawn King (distributors) or from "approved sources" (Count VI), *id.* at 238; (4) compelling the dealers to engage in cooperative advertising (Count I), *id.* at 241, and (5) imposing a right of first refusal upon the dealers' power to sell their franchises (Count I), *ibid.* The court found defendants not guilty of all other charges. Defendants' motions (1) to set aside the verdict, (2) for a directed verdict of acquittal *n. o. v.*, and (3) for a new trial were denied by the trial court at this point. In a second reported opinion, 152 *N.J.Super.* 333 (Law Div. 1977), the trial court fined defendant Lawn King a total of $120,000 ($40,000 for each conviction or set of convictions under Counts I, II, and VI), *id.* at 343 and sentenced defendant Sandler to two concurrent six-month terms in the Mercer County Correctional Center on the convictions under Counts I and II and a fine of $43,120, Sandler's average annual salary at the time, for the conviction under Count VI, *id.* at 341. As a result of this conviction, Sandler, under the State Antitrust

Act, was also thereafter prohibited "from managing or owning any business organization within this State, and from serving as an officer, director, trustee, member of any executive board or similar governing body, principal, manager, [or] stockholder owning 10% or more of the aggregate outstanding capital stock of all classes of any corporation doing business in this State . . . ." *N.J.S.A.* 56:9–11(b).

On appeal, the Appellate Division, relying on the then-recent case of *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 *U.S.* 36, 97 *S.Ct.* 2549, 53 *L.Ed.*2d 568 (1977), determined that the trial court had applied the wrong rule, and that the correct standard to apply to the vertical restraints, except for price-fixing or resale price maintenance, was "the rule of reason" rather than the *per se* rule. 169 *N.J.Super.* 346, 352–354 (App.Div.1979). This rule, in contrast to the *per se* rule, requires proof as to the reasonableness of the challenged restraints. *Id.* at 353–354. Furthermore, on the record before it, the Appellate Division determined that the evidence did not justify a finding of price-fixing here, *id.* at 358, nor were there any tie-in requirements in the franchise contracts, *id.* at 357. Therefore, there was no evident basis upon which to rest verdicts of guilty beyond a reasonable doubt in the allegations of vertical price-fixing. *Id.* at 359. The appellate court thus did not apply either test to these particular restraints. As to the right of first refusal and the cooperative advertising requirements, the appellate court applied the rule of reason test and found these alleged restraints to be reasonable. *Id.* at 357. The court noted that while the *per se* rule would still apply to instances of horizontal restraints, no such horizontal restraints existed in the case *sub judice, id.* at 352, the court summarily rejected in a footnote the contention that any of the alleged trade restraints here were in fact horizontal, *id.* at 354–355 n. 1. The Appellate Division then proceeded to reverse all convictions and entered judgments of acquittal on all counts for which defendants had been convicted. *Id.* at 359. This Court subsequently granted the State's petition for certification. 81 *N.J.* 400 (1979).

The crux of this appeal focuses upon the sharp and fundamental differences that divided the trial court and the Appellate Division as to the proper standard to be applied in determining the legality of these several trade practices. Hence, the framework for resolution of the issues on this appeal is provided by an explanation and a comparison of the decisions below, followed by a treatment of the specific questions raised.

Since one basic difference in the respective approaches of the lower courts involves the standard to be applied to the vertical restraints charged in Count I, we deal first with the nonpricing vertical restraints as to which the Appellate Division concluded that the rule of reason, rather than the *per se* rule, applies. We agree with that conclusion. Next addressed is vertical price-fixing, as to which both courts agreed that the *per se* rule was the proper standard. We concur in this reasoning, but affirm the Appellate Division's finding that here there were no illegal price restraints. Finally, with respect to all of the Count I vertical restraints, we deal with, and reject, the State's contention that these vertical restraints in the aggregate are to be adjudged under the stricter *per se* standard applicable to the vertical price restraints.

The next significant question discussed involves the presence and legality of alleged horizontal restraints. On this point we also agree with the Appellate Division and reach the conclusion that there has been no showing of any such horizontal restrictions. We then turn to the somewhat special problems posed by the restraints consisting of so-called tying arrangements or approved-source restrictions. On that issue we rule that, in light of the special characteristics and unusual complexities impinging upon franchise operations, the rule of reason must be applied to those restrictions.

In concluding our opinion, we express concerns as to some of the serious implications of the criminal prosecution involved in this appeal—the possible risks of double jeopardy and potential unfairness in a retrial arising from a reversal of defendants' convictions, and the general desirability and feasibility of civil rather than criminal prosecutions under the State Antitrust Act.

## II

As noted, the indictment in this case charged in multiple counts that several features of the Lawn King franchise operation constituted unlawful restraints of trade in violation of the provisions of the New Jersey Antitrust Act, *N.J.S.A.* 56:9–1 *et seq.* The particular business practices allegedly in restraint of trade related to (1) price-fixing, (2) exclusive franchise or territorial restrictions, (3) mandatory cooperative advertising, (4) the corporation's right of first refusal or other restrictions upon franchise transfers, and (5) various tying arrangements. It was charged in Count I of the indictment that several of these restraints were imposed "vertically," that is, imposed by Lawn King upon its distributors and its dealers. In addition, Count II of the indictment alleged that certain of these same practices also constituted "horizontal" restraints in that they were essentially enforced at the same level by the dealers and the distributors. Still other practices and relationships were asserted to be restraints imposed both vertically and horizontally.

█ Both courts below here agreed that the State Antitrust Act, *N.J.S.A.*, 56:9–1 *et seq.*, is not preempted under the Commerce Clause (*U.S.Const.*, Art. I, § 8) by federal antitrust enactments. 169 *N.J.Super.* at 349; 150 *N.J.Super.* at 216–218; see *Flood v. Kuhn*, 407 *U.S.* 258, 284, 92 *S.Ct.* 2099, 2112, 32 *L.Ed.2d* 728, 745 (1972); 1 P. Areeda & D. Turner, *Antitrust Law*, ¶ 209 (1978). We agree and further note that many states have, in fact, enacted comparable laws designed to regulate unlawful restraints and business practices, *e. g., Cal.Bus. & Prof.Code* §§ 16700 to 16760 (West 1964 & Supp.1978); *Ill.Rev. Stat.* ch. 38, §§ 60–1 to 60–11 (1977); *N.Y.Gen.Bus.Law* §§ 340–347 (McKinney 1968 & Cum.Supp.1978–1979), and that such state statutes have been found not to have been displaced by federal law, see *e. g., Marin County Board of Realtors, Inc. v. Palsson*, 16 *Cal.3d* 920, 549 *P.2d* 833, 130 *Cal.Rptr.* 1 (1976). See Empirical Research Project, "Reviving State Antitrust Enforcement: The Problems with Putting New Wine in Old Wine Skins," 4 *J.Corp.L.* 547, 566–567 (1979).

In fact, consonance between the federal and state enactments is required. See Wood, "Resurgence of State Antitrust Action: Prices and Public Awareness," 9 *Antitrust Law & Econ.Rev.* 41, 41 (1977). Courts in addressing state antitrust acts patterned after the federal Sherman Act, as is the New Jersey act, have concluded that federal court interpretations of federal law constitute persuasive authority as to the meaning of the particular state enactments. See, *e. g., Optivision, Inc. v. Syracuse Shopping Center Associates*, 472 *F.Supp.* 665, 680–681 (N.D.N.Y.1979) (New York antitrust act); *General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc.*, 421 *F.Supp.* 274, 294 (N.D.Cal.1976) (California antitrust act); *Marin County Board of Realtors, Inc. v. Palsson, supra*, 16 *Cal.*3d at 925, 549 *P.*2d at 835, 130 *Cal.Rptr.* at 3; *Corwin v. Los Angeles Newspaper Service Bureau, Inc.*, 4 *Cal.*3d 842, 852, 484 *P.*2d 953, 959, 94 *Cal.Rptr.* 785, 791 (1971) (*Corwin I*); *Guild Wineries & Distilleries v. J. Sosnick & Son*, 102 *Cal.App.*3d 627, 633, 162 *Cal.Rptr.* 87, 90 (1980); *Goldman v. Loubella Extendables*, 91 *Mich.App.* 212, 219, 283 *N.W.*2d 695, 699 (Ct.App.1979) (Michigan antitrust act). Moreover, the New Jersey act is to be construed "in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." *N.J.S.A.* 56:9–18. See *Exxon Corp. v. Wagner*, 154 *N.J.Super.* 538, 544 (App.Div.1977); see generally Rubin, "Rethinking State Antitrust Enforcement," 26 *U.Fla.L.Rev.* 653 (1974).

The trial court endeavored to apply federal decisional law in this case. It rejected as inapplicable to any of the alleged restraints the "rule of reason" test of *Standard Oil Co. of New Jersey v. United States*, 221 *U.S.* 1, 66, 31 *S.Ct.* 502, 518, 55 *L.Ed.* 619, 647 (1911), which test would require a detailed analysis of the actual reasonableness of the challenged restraints. 150 *N.J.Super.* at 222. The court followed instead the alternative approach that some business practices constitute *per se* violations of the Sherman Act and thus do not merit an inquiry into their reasonableness. *Ibid.*; see *Northern Pacific Ry. v. United States*, 356 *U.S.* 1, 5, 78 *S.Ct.* 514, 518, 2 *L.Ed.*2d 545, 549 (1958);

*United States v. Topco Associates, Inc.*, 405 *U.S.* 596, 606–607, 92 *S.Ct.* 1126, 1132–1133, 31 *L.Ed.2d* 515, 525 (1972). In so doing, the trial court specifically relied upon the then-viable, but now overruled, case of *United States v. Arnold, Schwinn & Co., supra*, 150 *N.J.Super.* at 224. The trial court went on to hold that the *per se* rule should be applied under the New Jersey Antitrust Act whether the suit is of a civil or a criminal nature and that, therefore, an illegal restraint of trade will be presumed if a *per se* violation is found. *Ibid.*

The Appellate Division, however, held essentially that the *per se* rule was not applicable to nonpricing vertical business restrictions. The Appellate Division pointed out that *Schwinn* had since been overruled by the Supreme Court in *Continental T.V., Inc. v. GTE Sylvania, Inc., supra*, and that the rule of reason standards earlier articulated in *White Motor Co. v. United States*, 372 *U.S.* 253, 261, 83 *S.Ct.* 696, 700, 9 *L.Ed.2d* 738, 745 (1963), and *Northern Pacific Ry. v. United States, supra*, were applicable to such practices. 169 *N.J.Super.* at 352. See generally Bohling, "A Simplified Rule of Reason for Vertical Restraints: Integrating Social Goals, Economic Analysis, and *Sylvania*," 64 *Iowa L.Rev.* 461 (1979); Robinson, "Recent Antitrust Developments—1979," 80 *Colum.L.Rev.* 1, 13 *et seq.* (1980); Casenote, "Vertical Restraints—Legality of Nonprice Vertical Restraints Determined Under Rule of Reason," 9 *Seton Hall L.Rev.* 496 (1978). Furthermore, the appellate court acknowledged that it was obligated to apply the law as it existed at the time of its decision. 169 *N.J.Super.* at 353. See *Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc.*, 572 *F.*2d 883, 885 (1 Cir. 1978), *cert.* den. 439 *U.S.* 833, 99 *S.Ct.* 112, 58 *L.Ed.2d* 128 (1978); *Busik v. Levine*, 63 *N.J.* 351, 361 (1973), app.dism. 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.2d* 733 (1973).

### III

We concur in the reasoning of the Appellate Division that, in the context of this case, the rule of reason, not the *per se* rule, is the correct standard to apply to the vertical restraints of trade alleged in Count I of the indictment except those relating to retail price-fixing.

Although the State's petition for certification fails to take direct issue with the Appellate Division's holding that, apart from those restraints involving price-fixing, other vertical restraints were lawful under the rule of reason, the issue is before us nonetheless. The State contends that Count I charged an aggregation of vertical trade restraints and that if one element of that aggregate is subject to the *per se* rule, then the validity of all such restrictions must be determined under the same *per se* rule; in such event, all the alleged restraints would be similarly invalid. We therefore initially address as a major issue in this appeal the question of whether the vertically-imposed, nonprice restraints are illegal under the rule of reason as determined by the appellate court.

## A

One of the allegations in Count I of the indictment in the case before us relates to vertical territorial restraints. That type of restriction was actually present in the *Sylvania* decision and its validity was specifically determined according to the rule of reason. As explained in *Sylvania,* under the rule of reason approach, established in *Standard Oil Co. of New Jersey v. United States, supra,* 221 *U.S.* at 66, 31 *S.Ct.* at 518, 55 *L.Ed.* at 647, the factfinder "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Sylvania, supra,* 433 *U.S.* at 49, 97 *S.Ct.* at 2557, 53 *L.Ed.*2d at 580 (footnote omitted); see generally Comment, "A Proposed Rule of Reason Analysis for Restrictions on Distribution," 47 *Fordham L.Rev.* 527 (1979). The exclusive territorial areas of franchises of the retail dealers involved in *Sylvania,* as well as in *Schwinn,* differed markedly from the "franchises" involved in this case; as a result, the franchise relationships here possibly present an even stronger situation for the application of the rule of reason.

A major purpose of the rule of reason is to foster interbrand competition, *i. e.,* competition among similar products, in contrast to intrabrand competition, which is competition

confined to sellers of the same product. See Sullivan, *The Law of Antitrust,* § 172 at 399–401 (1977). The retailers in *Sylvania* and *Schwinn* were independent retailers selling several different products and were not obliged to operate exclusively under the trademark of the particular manufacturer or to derive their store or business name from the particular products or named brands of the products that they sold. Hence, the restraints there imposed by the manufacturers, particularly the various territorial restrictions, would have an obvious deleterious impact upon interbrand competition. Lawn King retailers, on the other hand, sell only the products and services of the franchisor and only under the name of the franchisor. The restrictions that the franchisor imposes, including the exclusive territorial franchise, are intended to encourage a new franchise to compete on the interbrand level without the harassment of competition on the intrabrand level. This justification is sanctioned by *Sylvania,* absent demonstrable adverse economic effects or a complete lack of "redeeming virtues." *Sylvania, supra,* 433 *U.S.* at 49–55, 97 *S.Ct.* at 2557–2560, 53 *L.Ed.*2d at 579–583; see Sullivan, *supra,* § 172 at 399–401.

There has been no demonstration in this case that the territorial restrictions, albeit more restrictive than those in *Sylvania,* had a "pernicious effect" on the interbrand competition or that they lacked any "redeeming virtues." The State made no showing that consumers were not free to choose among the various lawn care service companies competing with Lawn King. Indeed, there was trial testimony to the effect that several interbrand competitors competed heavily in Lawn King dealership territories. Furthermore, the trial judge expressly found that no independent evidence had been offered to prove anticompetitive interbrand restraints of trade. 150 *N.J.Super.* at 223. *Cf. Packard Motor Car Co. v. Webster Motor Car Co.,* 243 *F.*2d 418, 420–421 (D.C.Cir.1957), *cert.* den. 355 *U.S.* 822, 78 *S.Ct.* 29, 2 *L.Ed.*2d 38 (1957) (absent evidence of attempt to gain control of relevant market, "exclusive dealerships" do not fall within scope of the penal provisions of the antitrust laws). We are completely satisfied that, under the legal precepts as applied

to the facts developed from the record in this case, the vertical territorial restrictions imposed by Lawn King creating exclusive franchises were not invalid.

While the *Sylvania* decision resurrected the rule of reason with respect to vertical territorial restrictions, that case has not generally been regarded as a narrow precedent to be limited strictly to its facts. The general thrust of the subsequent decisions interpreting *Sylvania* is that the Supreme Court's ruling in that case "evinces judicial reluctance to extend *per se* rules under [the Sherman Act]." *Magnus Petroleum Co. v. Skelly Oil Co.*, 599 *F.*2d 196, 204 (7 Cir. 1979), *cert.* den. 444 *U.S.* 916, 100 *S.Ct.* 231, 62 *L.Ed.*2d 171 (1979); see *First Beverages, Inc. v. Royal Crown Cola Co.*, 612 *F.*2d 1164, 1170 (9 Cir. 1980), *cert.* den. 447 *U.S.* 924, 100 *S.Ct.* 3016, 65 *L.Ed.*2d 1116 (1980); *Cowley v. Braden Industries, Inc.*, 613 *F.*2d 751, 754–755 (9 Cir. 1980), *cert.* den. 446 *U.S.* 965, 100 *S.Ct.* 2942, 64 *L.Ed.*2d 824 (1980); *Del Rio Distributing, Inc. v. Adolph Coors Co.*, 589 *F.*2d 176, 179 (5 Cir. 1979), *cert.* den. 444 *U.S.* 840, 100 *S.Ct.* 80, 62 *L.Ed.*2d 52 (1979); *Eastern Scientific Co. v. Wild Heerbrugg, Inc., supra,* 572 *F.*2d at 885; see generally Posner, "The Rule of Reason and the Economic Approach: Reflections on the *Sylvania* Decision," 45 *U.Chi.L.Rev.* 1 (1977). Hence, in this case, we should not willingly apply the *per se* rule generally to vertical business restraints but rather should, if possible, invoke the rule of reason.

Among the vertical nonprice-fixing restraints charged in Count I which the trial court here declared to be illegal under the *per se* rule were those regarding (1) the cooperative advertising program and (2) the corporation's right of first refusal should the franchisee decide to transfer the franchise. 150 *N.J.Super.* at 239–242. Under the terms of the franchise agreement, two types of advertising are used in the Lawn King system: (1) individual dealership advertising through direct mail and local newspaper advertisements (using only company-provided or company-approved formats), and (2) cooperative regional advertising through television and major daily newspapers in a metropolitan area. As to the individual dealership advertis-

ing, no challenges have been raised. As for the cooperative advertising, however, the trial court found that many dealers objected to such large-scale advertising in newspapers and on television but were nonetheless forced to pay for it if a majority of dealers in the coverage area formally approved the proposal. The Appellate Division, in summary fashion, held that neither of these practices—the cooperative advertising and the right of first refusal—was here illegal *per se*. It further noted that it could not even discern how such practices could produce a restraint of trade "in the statutory sense." 169 *N.J.Super.* at 357. The court also found that these particular obligations had been freely contracted and that their purpose was to protect the Lawn King image to the benefit of franchisor and franchisee alike. *Ibid.*

We conclude that the appropriate standard to apply in this regard is the rule of reason and we agree with the Appellate Division that the advertising practices were, therefore, not illegal. It is generally recognized that a manufacturer has the right to protect its trademark and goodwill through collective advertising as long as the purpose or the effect is not to monopolize the relevant market. *Nelligan v. Ford Motor Co.*, 262 *F.*2d 556, 558–559 (4 Cir. 1959); see Sullivan, *supra*, § 173 at 496–497. Defendants here produced evidence to justify their advertising approaches and to show that there were business advantages which redounded to the dealers collectively and which tended to enhance the goodwill of the entire Lawn King enterprise. *Cf. Miller Motors, Inc. v. Ford Motor Co.*, 252 *F.*2d 441, 446 (4 Cir. 1958) (dealer contributions to manufacturer for dealers' advertising association upheld under Sherman Act; "[i]t is enough that here substantial advantages inured to the dealers through the device of a single advertising program").

As to the restrictions on the transfer or resale of the franchises, to which the trial court similarly applied the *per se* rule, the State cites no authority supportive of such a *per se* application but nevertheless argues that the combination of the long-standing legal antipathy to restraints on alienation and the

vigorous enforcement procedures used here by defendants warrants an automatic finding of unreasonableness. The trial court failed to appreciate the special business needs and concerns that are intrinsic to a franchise operation and the particular importance of retaining legal control over the licensing or franchising aspects of such an operation. *Cf. Kestenbaum v. 'Falstaff Brewing Corp.*, 514 *F.*2d 690, 696 (5 Cir. 1975), *cert. den.* 424 *U.S.* 943, 96 *S.Ct.* 1412, 47 *L.Ed.*2d 349 (1976) (upheld franchisor's right to "restrict the class of persons with whom it would agree to continue a . . . franchise [as being "beyond question"] so long as such restriction was not artificially employed to further some unlawful practice").

We thus concur in the conclusion of the Appellate Division that this alleged vertical restraint, as well as that relating to advertising, was not illegal under the rule of reason test.

## B

■ Price restraints, also charged in Count I of the indictment, stand in a somewhat different posture from other vertical restraints. One of the earliest cases to deal with vertical price restraints was *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 *U.S.* 373, 31 *S.Ct.* 376, 55 *L.Ed.* 502 (1911). Defendant in that case had entered into written contracts with its wholesale customers obligating them to resell its medicines at fixed prices. The Supreme Court held the contracts to be void in that they violated both the common law doctrine against contracts in restraint of trade and the Sherman Act. *Id.* at 409, 31 *S.Ct.* at 385, 55 *L.Ed.* at 519. Ever since that decision, pure "resale price maintenance," the correct legal terminology for vertical price-fixing, has been held to be a *per se* violation of the antitrust laws. R. Bork, *The Antitrust Paradox* 280 (1978); Comment, "A Re-examination of the Per Se Illegality of Resale Price Maintenance," 83 *Dickinson L.Rev.* 95, 101 (1978). Both minimum and maximum pricing are regarded as *per se* illegal restraints of trade. *Albrecht v. The Herald Co.*, 390 *U.S.* 145, 152, 88 *S.Ct.* 869, 872, 19 *L.Ed.*2d 998, 1003–1004 (1968).

The general rationale for the *per se* rule, as expressed by the Supreme Court is that

> there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. [*Northern Pacific Ry. v. United States, supra,* 356 *U.S.* at 5, 78 *S.Ct.* at 518, 2 *L.Ed.*2d at 549.][5]

As recognized here by the Appellate Division, the *per se* approach itself has been refined and will be applied " 'only after considerable experience with certain business relationships. . . .' " 169 *N.J.Super.* at 351 (quoting *United States v. Topco, Inc., supra,* 405 *U.S.* at 607–608, 92 *S.Ct.* at 1133, 31 *L.Ed.* 2d at 525). The appellate court further noted that " '[t]he usual assumption is that a *per se* rule would grow out of a history of rule of reason cases all arriving at the same verdict.' " 169 *N.J.Super.* at 351 (quoting *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 *F.*2d 83, 88 (5 Cir. 1978), *cert.* den. 439 *U.S.* 1116, 99 *S.Ct.* 1021, 59 *L.Ed.*2d 75 (1979)).

The Appellate Division in the instant case recognized the essential point in this regard when it determined that the allegations of vertical price restraints imposed by Lawn King, *viz,* that the dealers charge their customers three cents per square foot (and for a minimum of 4000 square feet) for Lawn King's services, were not, under the circumstances, readily amenable to *per se* prohibition. The court stated that the principle to be applied even to vertical price restraints is that "although particular forms of vertical restraints might justify *per se* prohibition, it is 'clear that departure from the rule of reason standard must be based upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing.' " 169 *N.J.Super.* at 353 (quoting *Sylvania, supra,* 433 *U.S.* at 58–59, 97 *S.Ct.* at 2562, 53 *L.Ed.*2d at 585). The court relied on the recent cases of *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 *U.S.* 1, 99 *S.Ct.* 1551, 60 *L.Ed.*2d 1 (1979) (*BMI*), and *Eastern Scientific Co. v. Wild Heerbrugg Instru-*

---

[5] A finding of such "redeeming virtues" is "implicit in every decision sustaining vertical restrictions under the rule of reason." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 *U.S.* 36, 54, 97 *S.Ct.* 2549, 2560, 53 *L.Ed.*2d 568, 583 (1977).

*ments, Inc., supra,* for the proposition that the *per se* rule should in certain circumstances sometimes yield to the rule of reason even in cases involving price restrictions. 169 *N.J.Super.* at 353.

In *BMI* the Supreme Court was confronted with "blanket licenses" for music copyrights. Rather than automatically label this unusual business device as illegal "price-fixing," the Court stated that it had never before examined a similar practice, noting that " '[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations. . . .' " *Id.* 441 *U.S.* at 9, 99 *S.Ct.* at 1557, 60 *L.Ed.*2d at 10 (also quoting *United States v. Topco Associates, Inc., supra,* 405 *U.S.* at 607–608, 92 *S.Ct.* at 1133, 31 *L.Ed.*2d at 525). Because the nature of the practice involved therein necessitated an inquiry into whether the effect and the purpose "of the practice are to threaten the proper operation of our predominantly free market economy . . . or instead [are] designed to 'increase economic efficiency and render markets more, rather than less, competitive,' " the Court determined that the rule of reason itself would call for a similar inquiry and that more experience with the challenged restraint was required before a *per se* rule could apply. *Id.* 441 *U.S.* at 19–20, 99 *S.Ct.* at 1562, 60 *L.Ed.*2d at 16 (citation omitted); see *White Motor Co. v. United States, supra,* 372 *U.S.* at 261–263, 83 *S.Ct.* at 700–702, 9 *L.Ed.*2d at 745–747; see also *Northwest Power Products, Inc. v. Omark Industries, Inc., supra,* 576 *F.*2d at 88; but see *Catalano, Inc. v. Target Sales, Inc.,* 446 *U.S.* 643, 644- 645, 100 *S.Ct.* 1925, 1926, 64 *L.Ed.*2d 580, 583 (1980); Nannes, "A Price-Fixing Surprise, Per Se: Implications of the Catalano Case," 2(43) *Nat'l L.J.* 23 (1980).

Despite the usual sweeping formulation of the *per se* standard interdicting vertical price restraints, the rule is not devoid of all flexibility. There are lawful methods by which a manufacturer or franchisor can attempt to influence the pricing policies of its dealers. In *United States v. Colgate & Co.,* 250 *U.S.* 300, 307, 39 *S.Ct.* 465, 468, 63 *L.Ed.* 992, 997 (1919), the Supreme Court recognized that a manufacturer could influence the retail prices of its products by suggesting retail sales prices and by exercis-

ing its right to refuse to sell and its "independent discretion as to the parties with whom [it] will deal," absent a monopolistic purpose. While the progeny of *Colgate* have restricted its breadth, the case remains good law. See *United States v. Parke, Davis & Co.*, 362 *U.S.* 29, 80 *S.Ct.* 503, 4 *L.Ed.2d* 505 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 *U.S.* 707, 64 *S.Ct.* 805, 88 *L.Ed.* 1024 (1944); *FTC v. Beech-Nut Packing Co.*, 257 *U.S.* 441, 42 *S.Ct.* 150, 66 *L.Ed.* 307 (1922); see also 169 *N.J.Super.* at 358.

■ The *Colgate* doctrine applies in the situation where a manufacturer seeking to achieve resale price maintenance, or any other vertical restraint, does so through the exercise of its right to refuse to deal coupled with a prior announcement of that policy. The manufacturer must confine its conduct strictly to these devices and any action beyond the mere announcement of suggested prices or other restrictive policy plus a refusal to deal with any nonconformists will offend the *per se* rule. See *United States v. Parke, Davis & Co.*, *supra*, 362 *U.S.* at 43, 80 *S.Ct.* at 511, 4 *L.Ed.2d* at 515; *FTC v. Beech-Nut Packing Co.*, *supra*, 257 *U.S.* at 452–453, 42 *S.Ct.* at 154, 66 *L.Ed.* at 313; see also *Albrecht v. The Herald Co.*, *supra*, 390 *U.S.* at 149, 88 *S.Ct.* at 871, 19 *L.Ed.2d* at 1002; see generally Sullivan, *supra*, § 139 at 391–395.

■ In this case, the Appellate Division found that there was no evidence of coercion, that there was thus no illegal price-fixing on the part of Lawn King, and that, therefore, Lawn King's pricing policies were tolerable under the *Colgate* doctrine. 169 *N.J.Super.* at 358. The essence of the criminal charge against defendants concerning illegal price-fixing is that the three-cent-per-square-foot price for lawn maintenance was forced upon the franchisees. Illegal price-fixing may arise where a manufacturer "enters into agreements—whether express or implied from a course of dealing or other circumstances—with all customers . . . which undertake to bind them to observe fixed resale prices." *United States v. A. Schrader's Son, Inc.*, 252 *U.S.* 85, 99, 40 *S.Ct.* 251, 253, 64 *L.Ed.* 471, 475 (1920). In this case,

however, the franchise contracts did not impose price controls upon the franchisees. Hence, the issue as to vertical price restraints turns instead upon the nature and extent of the "coercion" exerted upon dealers to charge the specific three-cent price. *Cf. Simpson v. Union Oil Co.*, 377 *U.S.* 13, 17, 84 *S.Ct.* 1051, 1054, 12 *L.Ed.2d* 98, 102 (1964) ("a supplier may not use coercion on its retail outlets to achieve resale price maintenance").

As noted, there are exceptions to the rule that illegal price restraints are *per se* invalid. These are usually subsumed under the *Colgate* doctrine, which itself is of limited applicability. *George W. Warner & Co. v. Black & Decker Mfg. Co.*, 277 *F.*2d 787, 790 (2 Cir. 1960). Thus, *Parke, supra,* would prohibit any active exhortation of customers to adhere to suggested prices; anything beyond mere "suggestion" and "refusal to deal" constitutes *per se* illegal resale price maintenance. *Ibid.*; see *FTC v. Beech-Nut Packing Co., supra,* 257 *U.S.* at 452–453, 42 *S.Ct.* at 154, 66 *L.Ed.* at 313.

 Since, even within this legal framework, this is a fact-sensitive issue, some recapitulation of the evidence is necessary to evaluate the Appellate Division's conclusions. Defendants readily concede that they "recommended" the three-cent price to their dealers and that they "suggested" that dealers charge for a 4,000 square foot minimum. Defendants also acknowledge that these figures were included in company operational and promotional literature and advertisements and that accounting and billing procedures were also geared to a three-cent-per-square-foot charge.

On the other hand, it seems clear that Sandler and Lawn King permitted dealers to adjust the acreage, to give free "prep service," or to cut prices on chemicals and seeds to effect a reduction in the amount to be charged to customers, and that there was no concrete evidence that any franchises were terminated by Lawn King over pricing practices.

While the State argues that dealers were forced into submission to charge the three-cent price, its primary reliance was

upon certain statements by Sandler, such as "we all charge the same price," and an inference of coercion from the conversation between Sandler and Teitelbaum, a dealer, wherein the former said, " 'I have the right to say . . . what price you charge.' " This evidence was rejected by the Appellate Division which specifically found that Sandler's remarks did not reflect a policy of coercion. 169 *N.J.Super.* at 358–359.

The Appellate Division thus determined that the evidence was insufficient to show effective coercion resulting in price-fixing. We need not further attempt to characterize the Appellate Division's determination as independent factfinding or as appellate review. There is factual uncertainty both as to the degree of coercion involved and as to the purpose and effect of Lawn King's pricing practices in terms of monopolistic and general economic impact. Hence, the conclusion that these practices constituted *per se* unlawful retail price maintenance is not in these criminal proceedings sustainable beyond a reasonable doubt. Moreover, a determination that there was not illegal coercive price-fixing is particularly compelling in the franchising situation where the franchisor and franchisee are in contractual agreement to maintain quality control and a uniform image. Sullivan, *supra*, § 139 at 392; Von Kalinowski, *Antitrust Laws and Trade Regulation* § 65.01[2](6) (vol. 16–H, Bender Business Organization Series); see *Bailey's Bakery, Ltd. v. Continental Baking Co.*, 235 *F.Supp.* 705, 721–722 (D.Hawaii 1964), aff'd o. b. 401 *F.2d* 182 (9 Cir. 1968), *cert.* den. 393 *U.S.* 1086, 89 *S.Ct.* 874, 21 *L.Ed.2d* 779 (1969) (*per se* rule was inapplicable in civil antitrust suit because no "pernicious effects" were demonstrated and the plaintiff failed to allege that the fixed price in any way prevented the retailer from handling defendant's bread at a profit; nor was the court able to find evidence of "coercion"); see also *Engbrecht v. Dairy Queen Co.*, 203 *F.Supp.* 714, 720 (D.Kan.1962).

We conclude, therefore, that the judgments of acquittal entered by the Appellate Division with respect to the charges of illegal vertical retail price maintenance were correct.

## C

Finally, with respect to the diverse vertical restraints charged in Count I of the indictment, the State further urges the Court to consider the vertical restraints in the aggregate and maintains that a finding of *per se* illegality with respect to the price-fixing restrictions would justify invalidation of the remaining vertical restraints under the same standard. In support of this contention, the State cites *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 *U.S.* 690, 82 *S.Ct.* 1404, 8 *L.Ed.2d* 777 (1962), an antitrust case involving illegal attempts to monopolize the production and sale of vanadium. Therein the Supreme Court criticized the Court of Appeals for approaching the plaintiff's claims

> as if they were five completely separate and unrelated lawsuits . . . .. In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. ". . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." [*Id.* at 698–699, 82 *S.Ct.* at 1410, 8 *L.Ed.2d* at 784 (citation omitted).]

The Supreme Court added that "it is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Id.* at 707, 82 *S.Ct.* at 1415, 8 *L.Ed.2d* at 788.

In further support of their contention in this regard, the State cites *United States v. Sealy, Inc.*, 388 *U.S.* 350, 87 *S.Ct.* 1847, 18 *L.Ed.2d* 1238 (1967); *Timken Roller Bearing Co. v. United States*, 341 *U.S.* 593, 71 *S.Ct.* 971, 95 *L.Ed.* 1199 (1951), and *United States v. Bausch & Lomb Optical Co., supra,* for the proposition that the aggregation of a *per se* restraint, namely, price-fixing, with other, lawful restraints subjects them all to the harsher *per se* standard. These cases, however, are readily distinguishable from the instant matter.

Many of these decisions relied on by the State have lost much of their force in the wake of *Sylvania, supra*. See generally Koches, "Developments in the Law of Vertical Nonprice Restrictions: A Welcome Return to the Rule of Reason," 33 *U.Miami L.Rev.* 247 (1978). Thus, at the time of these decisions, many, if

not most, vertical restraints were in fact treated as *per se* illegal restraints of trade. *Cf. Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* 370 *U.S.* at 708, 82 *S.Ct.* at 1415, 8 *L.Ed.*2d at· 789 ("a concerted refusal to deal . . ., a price-fixing conspiracy, and an allocation of customers [are] all *per se* violations under § 1 of the Sherman Act"). Moreover, the State has not offered any proof that the territorial and other vertical restrictions were "ancillary to the price-fixing scheme," *White Motor, supra,* 372 *U.S.* at 260, 83 *S.Ct.* at 700, 9 *L.Ed.*2d at 744, or were an "integral part of the whole distribution system," *Bausch & Lomb, supra,* 321 *U.S.* at 720, 64 *S.Ct.* at 812, 88 *L.Ed.* at 1033. Finally, and most to the point, we have determined that the Appellate Division's conclusion, that there was an insufficient showing of coercion to establish beyond a reasonable doubt a *per se* price-fixing offense, was essentially correct. Hence the *per se* standard, applicable to vertical price-fixing, in the context of this case is not transferable to other vertical restraints.

We therefore conclude, as did the Appellate Division, that the aggregation of various vertical price restraints does not justify utilization of the *per se* rule, instead of the rule of reason otherwise applicable, to determine the legality of these several business practices.

### IV

There is considerable confusion in this case as to the precise issues relating to alleged horizontal restraints of trade. The trial court initially said that "[t]he present case is clearly a 'vertical' restraint," 150 *N.J.Super.* at 223. It later labelled at least the territorial restraints as "essentially horizontal in nature" because they "are at the *same* market level . . . ." *Id.* at 229 (emphasis in original). In addition to finding convictions on Count I, the court also adjudicated defendants guilty under Count II which charged basically that the various restraints of Count I were horizontal as well. Somewhat related to the issue of whether there were proper convictions for horizontal restraints of trade under Count II is whether there were

similar restraints (*i. e.*, "boycotts" of sources of supply) emanating from conspiracies and combinations not only between Lawn King and its distributors and dealers but also horizontally among the latter groups as alleged in Count VII.

The Appellate Division summarily disposed of the State's argument that the defendants "aided and abetted" in a conspiracy to engage in horizontal restraints of trade in the following footnote:

> The State's argument that the arrangements here entered were in fact horizontal in nature and not vertical is unpersuasive. Reliance for its contention is placed on *United States v. Topco Associates, Inc., supra*, and *United States v. Sealy, Inc. [supra]*. In both of these cases defendants were corporations created and operated only as vehicles through which their stockholders carried on clearly anticompetitive horizontal business practices. Lawn King's position with respect to its franchisees is in no way comparable. [169 *N.J.Super.* at 354–355 n.1.]

We agree entirely. *United States v. Sealy, Inc., supra*, involved the formation by a group of franchisees of a company to license manufacturers of mattresses and bedding products under the Sealy trademark. The Supreme Court found that the manufacturer-licensees constituted a joint venture each member of which was allotted an exclusive territory. Employing a substance-over-form analysis, the Court found these restraints to be horizontal rather than vertical, 388 *U.S.* at 352–353, 87 *S.Ct.* at 1849–1850, 18 *L.Ed.*2d at 1241–1242, and that a pervasive horizontal price-fixing and territorial allocation system existed at the behest of these licensees under the "aggregation of trade restraints" theory regardless of the reasonableness of the territorial restrictions, *id.* at 357–358, 87 *S.Ct.* at 1852–1853, 18 *L.Ed.*2d at 1244.

*Topco, supra*, involved an analogous arrangement. Topco was a cooperative association of approximately 25 supermarket chains formed to serve as a purchasing agent for its members. Each member chain operated independently and none was conducted under the Topco name. All of the Topco stock was owned by the member chains. The government charged Topco with illegal horizontal territorial allocations. The Supreme Court found the *Sealy* case to be on "all fours" with *Topco* and thus applied the *per se* rule to the horizontal restraints. 405 *U.S.* at 609, 92 *S.Ct.* at 1134, 31 *L.Ed.*2d at 526.

■ The Lawn King system is in no way comparable to the situations outlined in *Topco* and *Sealy*. It is not disputed that Sandler and the corporation were in ultimate control of the entire franchise operation, including the individual dealer-franchisees, and that all restrictions were imposed vertically. No inference can be drawn that the dealers themselves in any way owned, controlled, or influenced the franchisor or conspired to enforce these restrictions as against the corporation. Here the dealers and distributors, by contracting with Lawn King, voluntarily entered into franchise agreements and subjected their franchises to Lawn King's restraints.

■ A further issue as to the alleged horizontal price-fixing under Count II is whether there was sufficient proof from which the court could infer that the dealers, knowing that concerted action was contemplated and invited, gave "their adherence to the scheme and participated in it." See *Interstate Circuit, Inc. v. United States*, 306 *U.S.* 208, 226, 59 *S.Ct.* 467, 474, 83 *L.Ed.* 610, 620 (1939) (clear evidence of joint conspiracy among several movie distributors who simultaneously engaged in uniform complex business practices). Courts, however, have insisted upon persuasive evidence of an independent agreement among those acting jointly on the same level in order to find a horizontal arrangement. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 *U.S.* 537, 541, 74 *S.Ct.* 257, 259, 98 *L.Ed.* 273, 279 (1954). Thus, "conscious parallelism" in behavior is not *per se* conspiratorial conduct; retailers who adhere to suggested retail prices, knowing that compliance by competitors is expected by the manufacturer in consonance with its price maintenance policy, do not thereby, without more, become co-conspirators with the manufacturer. *Bogosian v. Gulf Oil Corp.*, 561 *F.*2d 434, 446 (3 Cir. 1977), *cert.* den. 434 *U.S.* 1086, 98 *S.Ct.* 1280, 55 *L.Ed.*2d 791 (1978); *Klein v. American Luggage Works, Inc.*, 323 *F.*2d 787, 791 (3 Cir. 1963); see generally Note, "Conscious Parallelism and the Sherman Act: An Analysis and a Proposal," 30 *Vand.L.Rev.* 1227 (1977).

The trial court apparently convicted defendants of horizontal restraints of trade under the *per se* rule. There being no

evidential basis for a determination that restraints were either imposed or enforced horizontally, the convictions under Count II were properly reversed by the Appellate Division.

### V

The remaining major issue concerning the substantive charges of the indictment relates to the validity of the product-tying arrangements or approved source restrictions imposed by Lawn King as alleged in Count VI thereof. That count charged illegal tying arrangements involving the dealers' and distributors' purchase of the chemicals and seeds used in the operation of their Lawn King franchises. Judgments of acquittal were entered by the trial court on other counts which charged similar tying arrangements involving machinery used in the operation of Lawn King dealerships; these latter charges are thus not now before the Court.

In this case, the original dealership agreement form used by Lawn King required that dealers " 'use only such products in the equipment that are furnished and sold by the COMPANY . . [and] to purchase, from the COMPANY or from such sources as shall be approved by the COMPANY in writing, all products, raw materials and supplies for the conduct of such business.' " 150 *N.J.Super.* at 236. Sometime in late 1971 or early 1972 defendants amended the agreement form to provide that " '[a]ll chemicals[,] . . . grass seeds and similar products used by the DEALER . . . shall either be purchased from the COMPANY, an official COMPANY DISTRIBUTOR or any other source approved by the COMPANY.' " *Ibid.* This provision is followed by a rather detailed procedure to be used when seeking approval of outside sources of supply.

A "tying arrangement" has been described as

an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. [*Northern Pacific Ry. v. United States, supra,* 356 *U.S.* at 5–6, 78 *S.Ct.* at 518, 2 *L.Ed.*2d at 550 (footnote omitted).]

Tying arrangements have generally been held to be invalid *per se. Id.* at 6, 78 *S.Ct.* at 518, 2 *L.Ed.*2d at 550; but see *Susser v.*

*Carvel Corp.*, 332 *F*.2d 505, 518 (2 Cir. 1964), *cert.* dism. 381 *U.S.* 125, 85 *S.Ct.* 1364, 14 *L.Ed.*2d 284 (1965). The reasons for this rule were expressed in *Times-Picayune Publishing Co. v. United States*, 345 *U.S.* 594, 605, 73 *S.Ct.* 872, 878, 97 *L.Ed.* 1277, 1288 (1953), as follows:

> By conditioning [its] sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the "tied" product's merits and insulates it from the competitive stresses of the open market. But any intrinsic superiority of the "tied" product would convince freely choosing buyers to select it over others, anyway.

The evil of tying arrangements inheres in a seller's use of its economic power in one product to advance its position in a quite distinct product market on a basis other than the competitive merits of the tied product. Sullivan, *supra*, § 156 at 445; see *International Salt Co. v. United States*, 332 *U.S.* 392, 396, 68 *S.Ct.* 12, 15, 92 *L.Ed.* 20, 26 (1947). "Tying is said to have no other purpose or effect and thus offends antitrust values in two respects[:] by foreclosing competitors of the seller from fair access to that part of the market for the tied product which is foreclosed by the tie, and by reducing the range of choice open to buyers of that product." *Ibid.* (footnote omitted); see also *Standard Oil Co. of Cal. v. United States*, 337 *U.S.* 293, 314–315, 69 *S.Ct.* 1051, 1062, 93 *L.Ed.* 1371, 1386–1387 (1949).

 Certain indicia must be present for a practice to constitute a tying arrangement. The party allegedly effecting the tie must possess "sufficient economic power to impose an appreciable restraint on free competition in the tied product." *Northern Pacific Ry. v. United States, supra*, 356 *U.S.* at 11, 78 *S.Ct.* at 521, 2 *L.Ed.*2d at 553; *accord, Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 *U.S.* 495, 502–503, 89 *S.Ct.* 1252, 1258, 22 *L.Ed.*2d 495, 505 (1969) (*Fortner I*). Possession of a trademark in a distinctive product name has been regarded as constituting such "sufficient economic power." *Carpa, Inc. v. Ward Foods, Inc.*, 536 *F*.2d 39, 45 (5 Cir. 1976); *Siegel v. Chicken Delight, Inc.*, 448 *F*.2d 43, 50 (9 Cir. 1971), *cert.* den. 405 *U.S.* 955, 92 *S.Ct.* 1172, 1173, 31 *L.Ed.*2d 232 (1972); *contra, Capital Temporaries, Inc. v. Olsten Corp.*, 506 *F*.2d 658, 663 (2 Cir. 1974); *Susser v. Carvel Corp., supra*, 332 *F*.2d at 519; see generally McCarthy, "Trademark Franchising and Antitrust: The Trouble

with Tie-ins," 58 *Cal.L.Rev.* 1085 (1970); Note, "Trademark Franchising and Antitrust Law: The Two-Product Rule for Tying Arrangements," 27 *Syracuse L.Rev.* 953 (1976). A franchise itself would ordinarily be regarded as "sufficient economic power" to effectuate a tying arrangement. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 375–377 (5 Cir. 1977). In addition, it must be shown that the arrangement has affected "a 'not insubstantial' amount of interstate commerce" in the tied product. *Id.* at 375; see *United States v. Loew's Inc.*, 371 *U.S.* 38, 48–49, 83 *S.Ct.* 97, 103–104, 9 *L.Ed.*2d 11, 20–21 (1962).

In discussing tie-ins, the court in *Kentucky Fried Chicken, supra,* recognized that tying arrangements are generally illegal *per se* and that such a designation means that a plaintiff need not demonstrate that the actual effects of the tie are unreasonable. 549 *F.*2d at 374. A defendant is guilty of an illegal tying arrangement unless it can establish "certain narrow affirmative defenses," *id.* at 375, one of which is that "the tie constitutes a necessary device for controlling the quality of the end product sold to the consuming public," *id.* at 376. Even with respect to such a defense, however, the defendant must establish that the tie constitutes the "method of maintaining quality that imposes the least burden on commerce." *Ibid.*; see *Carpa, Inc. v. Ward Foods, Inc., supra,* 536 *F.*2d at 46.

On this issue, the Appellate Division here decided, under the circumstances, not to apply the *per se* rule of illegality with respect to the tying arrangement. It determined that the proper standard is instead the rule of reason. In this disposition, we agree. Our reasons relate primarily to the novelty and complexity of the issue and the lack of judicial experience with its resolution. This result is not inconsistent with federal decisional law in this regard. *Cf. BMI, supra,* 441 *U.S.* at 9–10, 99 *S.Ct.* at 1557, 60 *L.Ed.*2d at 10 (certain novel commercial arrangements with which courts have as yet had little experience may be subject to the rule of reason rather than the *per se* rule).

The court in *Kentucky Fried Chicken* well expressed these reasons as applied to a franchise operation, *viz.*:

> In the commonly recurring situation, the tying product is the franchise itself, and the tied products may be such things as the equipment the franchisee will use to conduct the business, the ingredients of the goods the franchisee will ultimately sell to consumers, or the supplies the franchisee will distribute to the public in connection with the main product. As an original matter it is less than self-evident that such arrangements should be treated as garden-variety tie-ins, to be analyzed in accordance with the same tying principles developed in other contexts. Unlike that of the tying party in a prototypal tying case, a franchisor's own success may depend in large measure on the success of the tie's "victim", the franchisee. The franchisor will succeed only by establishing a favorable reputation among the consuming public, and in building that reputation the franchisor must depend largely on the quality of the franchisee's performance. A franchisor will rarely have an opportunity to explain to a dissatisfied customer that the fault was only that of the particular franchisee. The franchisor may therefore have legitimate as well as illegitimate reasons for restraining the franchisee's choices in the tied product market. [549 *F.*2d at 375.]

The Appellate Division with considerable perspicacity recognized that the very considerations which prompted the Supreme Court in *Sylvania* to restore the rule of reason with regard to certain vertical nonprice restraints have special relevancy to a franchise business entity. The validity of the challenged restraints in the context of a business franchise, in the court's view, "required [both] a sensitive weighing of pro-competitive against anti-competitive effects" of defendants' practices and an assessment of whether "their overall effect may have been to strengthen the franchisees' competitive positions as against rival organizations and thereby stimulate competition on a wider plane." 169 *N.J.Super.* at 354. The appellate court stressed "the need for sound insight into the form of business enterprise under study [—] the franchise system of distributing goods and services," quoting *Ungar v. Dunkin' Donuts of America, Inc.,* 531 *F.*2d 1211, 1222–1223 (3 Cir. 1976), *cert.* den. 429 *U.S.* 823, 97 *S.Ct.* 74, 50 *L.Ed.*2d 84 (1976) (in evaluating the validity of trade practices in connection with a franchise, " 'the underlying issues are economic as much as legal' "). 169 *N.J.Super.* at 355–356.

An additional important reason impels us in this case to apply the rule of reason to the product-tying and approved-source provisions of the Lawn King operation. The rule for determining the validity of these business devices from a statutory antitrust perspective is here being invoked in a criminal prosecu-

tion under the State Antitrust Act. Because it is a criminal prosecution, the Court should proceed with even greater caution. This is not to suggest that the choice of the proper standard would necessarily be different or less difficult were the prosecution here civil rather than criminal. Nor is it to be implied from our emphasis upon the criminal nature of these proceedings that the application of the *per se* rule, instead of the rule of reason, to these restraints raises possible constitutional questions involving violations of due process. See Brosnahan & Dowling, "The Constitutionality of the Per Se Rule in Criminal Antitrust Prosecutions," 16 *Santa Clara L.Rev.* 55, 74–75 (1975). Rather, our concern emanates from the serious consequences involved in a criminal prosecution, illustrated in this case itself by the substantial criminal sanctions actually imposed upon defendants. 152 *N.J.Super.* at 341, 343; *ante* at 188.

Supplementing these considerations are the self-evident complexities of the issues in this case as well as the unforeseen ramifications which any decision here will have beyond the interests of the actual litigants. The State Antitrust Act, as sought to be applied in this case, touches franchise business operations, a subject area which is also governed in part by other statutes. In particular, defendants here are subject in their business operations to the New Jersey Franchise Practices Act, *N.J.S.A.* 56:10–1 *et seq.* Many of the trade practices contested in this prosecution involving the rights and obligations of franchisors and franchisees are thus implicated by both statutes. 169 *N.J.Super.* at 355 n.2. See, *e. g., Shell Oil Co. v. Marinello,* 63 *N.J.* 402, 409 (1973), *cert.* den. 415 *U.S.* 920, 94 *S.Ct.* 1421, 39 *L.Ed.2d* 475 (1974) (*N.J.S.A.* 56:10–5 regulates right of franchisor to terminate franchise); *N.J.S.A.* 56:10–6 (limiting right of franchisee to transfer franchise); see also *N.J.S.A.* 56:10–7 (enumeration of prohibited acts).

These questions raise new issues in our jurisdiction which may or may not be adequately addressed by the decisions of other courts. We do note that the several cases which have applied the *per se* rule to tie-in arrangements in a franchise business operation, *e. g., Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., supra; Carpa, Inc. v. Ward Foods, Inc.,*

*supra,* did not involve criminal prosecutions and did not, apparently, raise the issue of the interrelationship between penal antitrust statutes and general franchise statutes. Hence, we have no solid basis grounded either in experience or in empirical evidence to give us the degree of confidence required for the application of the *per se* rule to the particular tie-in arrangements which are the subject of the indictment against defendants, *viz,* requiring dealers to purchase their seeds and chemicals only from either Lawn King or from an "approved source." The Appellate Division was therefore correct in refusing to follow that rule. See generally Zeidman, "The Rule of Reason in Franchisor-Franchisee Relationships," 47 *Antitrust L.J.* 873 (1978). Consequently, we affirm that court's determination addressed to the sufficiency of the evidence that there should be a judgment of acquittal under that count of the indictment charging illegal product-tying arrangements.

## VI

It is our conclusion, for the reasons set forth in this opinion, that the Appellate Division reached the correct result in directing the entry of judgments of acquittal in this case. This disposition is buttressed by several additional considerations which should be mentioned.

Even if the appellate courts here were of a mind only to reverse the judgments of convictions and to remand the matter for a retrial, rather than to direct the entry of judgments of acquittal, serious questions implicating double jeopardy would be raised. See *U.S.Const.,* Amend. V; *N.J.Const.* (1947), Art. I, par. 11. The State here made a conscious decision to limit its evidence of criminality to that required under the *per se* rule. It need not, however, have taken so restrictive an approach as to the presentation of its evidence. As we have indicated, *ante* at 199–200, 210, there are situations in novel cases, such as this, in which additional evidence would be required as to the reasons or justification for retail price restrictions or other restraints in order to determine whether the *per se* rule should be applied. This would be the case either because of the court's lack of familiarity with the particular business practice (*e. g., BMI,*

*supra*, 441 *U.S.* at 9–10, 24, 99 *S.Ct.* at 1557, 1565, 60 *L.Ed.*2d at 10, 19) or because of exceptions to the *per se* rule (*e. g., United States v. Colgate & Co., supra*, 250 *U.S.* at 307, 39 *S.Ct.* at 468, 63 *L.Ed.* at 997). Furthermore, in the instant case, the State clearly anticipated and was actually confronted by defendants' evidence as to the reasonableness of and justification for various alleged restraints. Under these circumstances, where the State has had a reasonable opportunity to present complete evidence against a defendant in a criminal trial but has failed to do so, its conscious election to restrict its evidential presentation, designed to serve its own prosecutorial convenience, should foreclose it from seizing another opportunity to prosecute defendants. *Cf. State v. Lynch*, 79 *N.J.* 327, 343 (1979) (miscalculation as to appropriate evidence needed to withstand motion for judgment of acquittal bars retrial when acquittal is entered); *State v. Tropea*, 78 *N.J.* 309, 316 (1978) (State's failure to present any evidence of an essential element of offense bars retrial of defendant).

Moreover, the Appellate Division's judgments of acquittal on appeal not only involved a determination that the legal doctrines that had been applied by the trial court were erroneous; its decision was also based upon fresh factual determinations on such important issues as the nature and extent of coercion in connection with the vertical price-fixing restraints, the nonexistence of horizontal restraints, and the absence of unlawful combinations and conspiracies. These factual determinations are necessarily intertwined and affect the entire criminal prosecution. See, *e. g., Continental Ore Co. v. Union Carbide & Carbon Corp., supra*, 370 *U.S.* at 698–699, 82 *S.Ct.* at 1409–1410, 8 *L.Ed.*2d at 784. This posture of the case raises serious questions, founded upon double jeopardy considerations, as to whether a retrial following the reversal on appeal would have been barred. *Burks v. United States*, 437 *U.S.* 1, 15–16, 98 *S.Ct.* 2141, 2149–2150, 57 *L.Ed.*2d 1, 12–13 (1978); *Greene v. Massey*, 437 *U.S.* 19, 24–25, 98 *S.Ct.* 2151, 2154–2155, 57 *L.Ed.*2d 15, 21 (1978).

Another equally important concern touching upon notions of finality is also served by our affirmance of the judgments of

acquittal. We cannot be impervious to the chronological fact that defendants here were indicted in June 1973, that they were not brought to trial until 1975, and that their prosecution will have been completed only upon the issuance of our decision today, seven years after indictment. To observe that this trial has been arduous, prolonged, and costly is a great understatement. Much of the travail, it seems, stems from the State's initial decision to prosecute defendants criminally under the State Antitrust Act, rather than by civil action. That is a decision which reposes solely within the discretion of the State. We, of course, do not presume to suggest that criminal prosecution may not in a given case be the desired or appropriate vehicle to effectuate the underlying public policy of the statute. These matters, we readily concede, are reserved to the Attorney General rather than to the courts. Cf. *State v. Leonardis*, 73 *N.J.* 360, 381 (1977) (great deference should be given to prosecutor's decision concerning the accused's enrollment in pretrial intervention program); *In re Ringwood Fact Finding Committee*, 65 *N.J.* 512, 516–517 (1974) (prosecutors have broad discretion in selecting matters for criminal prosecution).

Because of the enormous difficulties entailed in a criminal antitrust prosecution, attributable primarily to the intractable complexities intrinsic to the subject matter, the principles of law involved (the threshold application of the *per se* rule and the rule of reason requiring extended and detailed proofs), and, of course, the heavy burden of proof on the State in a criminal case, the probabilities of an expeditious and successful prosecution in this case were certainly tempered from the outset. Query whether the important interests sought to be vindicated by this criminal prosecution could not have been more appropriately protected through civil suits under the State Antitrust Act.

As this case now draws to a close, there appear to be no real victors. The State has lost through a failed prosecution, leaving at this time unvindicated the public interest it sought to protect. Defendants, in terms of the psychic, social, and commercial suffering resulting from a prolonged criminal prosecution, have

also not truly won. Yet, there is a lesson in all of this. The State Antitrust Act, we again note, in its extensive and detailed provisions for civil remedies offers reasonable, if not preferable, alternatives for the effectuation of the State's public policy.

These concluding remarks are not intended to be didactic. They are made only to emphasize that the result reached in this case, dictated by both the facts and the law, should not be thought to foreclose other constructive approaches to the problems underlying this litigation; nor should our ultimate determination be interpreted as a lack of awareness on the part of the Court with respect to the significant public concerns which actuated this prosecution.

Accordingly, the judgment below is affirmed.

PASHMAN, J., concurring.

I concur in the judgment and opinion of the Court with the following reservation. The Court's opinion observes that the double jeopardy clauses of the federal and State constitutions, *U.S.Const.*, Amend. V; *N.J.Const.* (1947), Art. I, par. 11, raise "serious questions" regarding the propriety of a second trial under the correct legal standards adopted by the Appellate Division and this Court. See *ante* at 212–214. While the majority does not appear to answer these questions, I believe they must be addressed and resolved. In its petition for certification, the State sought review of "the improper preclusion of retrial even if the Appellate Division's antitrust analysis was correct." Pet. for Certif. at 1. Since our grant of certification, 81 *N.J.* 400 (1979), was not limited, the propriety of denying a retrial is an issue squarely before this Court.

After concluding that the trial court had applied an erroneous standard of *per se* illegality to the vertical restraints employed by defendants, the Appellate Division independently assessed the record under the "rule of reason" and found insufficient evidence of any wrongdoing. *State v. Lawn King, Inc.*, 169 *N.J.Super.* 346, 353–359 (App.Div.1979). The court thus exercised its power under our Rules of Court to conduct a factual inquiry for "the complete determination of any matter on review." *R.* 2:10–5. Once the Appellate Division conducted this

review of the record, defendants were placed in jeopardy of conviction under the proper legal standards. After the court found the existing evidence could not support any convictions, defendants were thus in the same position as a defendant whose conviction "was reversed by an appellate court solely for lack of sufficient evidence to sustain [a guilty] verdict." *Burks v. United States*, 437 *U.S.* 1, 2, 98 S.Ct. 2141, 2143, 57 L.Ed.2d 1 (1978). Accordingly, the double jeopardy clauses of both the State and federal constitutions prohibit a retrial under legal principles embodying the "rule of reason." See *Greene v. Massey*, 437 *U.S.* 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *Burks, supra; Benton v. Maryland*, 395 *U.S.* 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *State v. Lynch*, 79 *N.J.* 327, 399 *A.2d* 629 (1979); see also *State v. Tropea*, 78 *N.J.* 309, 394 *A.2d* 355 (1978); *State v. Farmer*, 48 *N.J.* 145, 224 *A.2d* 481 (1966), *cert.* den., 386 *U.S.* 991, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967). I would therefore reject on constitutional grounds the State's argument that a second trial is warranted. Except for the apparent view of the majority that there is no need to make this constitutional ruling, I join in the judgment and opinion of the Court.

PASHMAN, J., concurring in the result.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, SCHREIBER, HANDLER and POLLOCK—6.

*For reversal*—None.